J. B. Lyon & Co.

*v.*

Culbertson, Blair & Co.

1. Usage of trade — *as affecting contracts.* Where there is a well known usage which obtains in trade, it will be presumed that all who engage in that business, where it prevails, contract with a view to it, unless they exclude the presumption by their contract. Hence, a usage may be proved to interpret the otherwise indeterminate intention of the parties, and to ascertain the nature and extent of their contracts.

2. A commercial usage, to take the place of general law, must be so uniformly acquiesced in for such a length of time as to force the inference that it entered into the minds of the contracting parties and formed a part of the contract.

3—83d Ill.

3. Contract—*for future delivery.* On a contract for the sale and delivery of grain at a future day, where the delivery and payment are to be concurrent acts, neither party can put the other in default without performing on his part, or offering to perform.

4. A contract for the sale of wheat in store, to be delivered at a future time, which requires the parties to put up margins as security, and provides that, if either party fails, on notice, to put up further margins according to the market price, the other may treat the contract as filled immediately, and recover the difference between the contract and market price, without offering to perform on his part, or showing an ability to perform, is illegal and void, as having a pernicious tendency.

Appeal from the Superior Court of Cook county.

Mr. Leonard Swett, and Mr. John J. Herrick, for the appellants.

Messrs. Dent & Black, for the appellees.

Mr. Justice Walker delivered the opinion of the Court:

We learn, from this record, that appellees, as partners in the firm of Culbertson, Blair & Co., brought suit against appellants, also partners, doing business under the name of J. B. Lyon & Co., to recover damages for an alleged failure to perform contracts for the purchase of a quantity of wheat.

There were several contracts, alike in their terms, except as to amounts and dates, and they were signed by different persons. This is a copy of one of them:

"Chicago, *August* 14, 1872.

"We have this day bought of Culbertson, Blair & Co. 10,000 bushels of No. 2 spring wheat, in store, at $1.57½ per bushel, to be delivered, at sellers' option, during August, 1872. This contract is subject, in all respects, to the rules and regulations of the board of trade of the city of Chicago.

J. B. Lyon & Co., C."

The rules and regulations referred to are embraced in—

"Rule IX.   Margins on Time Contracts.

"Section 1.   On all time contracts, made between members of the association, deposits for security and margin may

be demanded by either or both parties; said margin not to exceed ten (10) per cent on the value of the property bought or sold on the day it is demanded. All such deposits to be made with the treasurer of the association, unless otherwise agreed upon by the parties. Said deposits and margins may be demanded on and after the date of contract, and from time to time, as may be necessary to fully protect the party calling for the same. When margins are demanded, the party called upon shall be entitled to deduct from the margin called any difference there may be in his favor between the market price and the contract price of the property bought or sold. Any deposit made to equalize the contract price with the market price shall be considered as a deposit for security, and not margin.

" SEC. 2. Should the party called upon, as herein provided for, fail to respond within the next banking hour, it shall thereafter be optional with the party making such call, by giving notice to the delinquent, to consider the contract filled at the market value of the article at the time of giving such notice; and all differences between said market value and the contract price shall be settled the same as though the time of said contract had fully expired: *Provided, however*, that, when the call is made during the general meeting of the board between 11 A. M. and 1 P. M., the deposit shall be made before 2 o'clock of the same day."

Under these contracts, deposits and margins were put up by the parties in conformity to the rules, from time to time. On the 19th day of August, 1872, the market for No. 2 spring wheat opened at from $1.55 to $1.57, and declined during the day, closing, after exchange hours, at from $1.44 to as low as $1.38. On the 20th, the market opened at from $1.27 to $1.34, and fell rapidly during business hours. Between 11 and 1 o'clock, it was as low as $1.10 to $1.11 per bushel.

It is claimed that, on the morning of the 20th, appellees became entitled to further deposits, and thereupon, by written notice sent to the office of the buyers, demand was made of

Lyon & Co. for further margins, but failing to respond to the demand within the next banking hour, Culbertson, Blair & Co. elected, under the rules, to consider the contracts filled, and charged to account of Lyon & Co. the difference between the purchase price and $1.11½, and notified appellants thereof. This difference is the matter in dispute between the parties. On a trial in the court below, the jury found for plaintiffs the difference as claimed. A motion for a new trial was overruled, and judgment rendered on the finding, and this appeal is brought by defendants.

The contract signed by Anderson has been adjusted, and hence it is not necessary to be considered; but the contracts signed by Templeton, as the purchaser, were admitted in evidence against the objections of appellants. The court excluded evidence offered by appellees to show a usage among the members of the board of trade to demand of the broker the name of his principal at the time of the purchase, and failing to do so, it was regarded as an election by the seller to look alone to the agent for a fulfillment of the contract. The proper foundation for the introduction of this evidence was laid.

Inasmuch as the great mass of commercial business is transacted by men pressed by their affairs, and who are not in the habit, even if time would permit, of reducing their agreements to writing, beyond a mere memorandum, the courts are compelled to look to the usages of trade or business to learn the real intention of the parties. If proof of such usages was not allowed, it is believed that, in a large number, if not the greater portion, of commercial transactions, the intention of the parties would be defeated, instead of being enforced, when differences should occur between them. Where there is a well known usage which obtains in trade, it must be presumed that all who are engaged in that business, where it prevails, contract with a view to it, unless they exclude the presumption by their contract. Hence, it has been repeatedly held by this court that a usage may be proved to interpret the otherwise indeterminate intention of the parties, and to ascertain

the nature and extent of their contracts, not from their express stipulations, but from mere implication and presumptions, and acts of doubtful or equivocal character; but to have commercial usage take the place of general law, it must be so uniformly acquiesced in for such a length of time that the jury will feel themselves constrained to find that it entered into the minds of the parties and formed a part of the contract. *Dixon* v. *Dunham*, 14 Ill. 324; *Crawford* v. *Clark*, 15 ib. 561; *Munn* v. *Burch*, 25 ib. 35; *Fay* v. *Strawn*, 32 ib. 295; *Deshler* v. *Beers*, 32 ib. 368; *Home Insurance Co.* v. *Favorite*, 46 ib. 263; *Turner* v. *Dawson*, 50 ib. 85. Other cases might be cited in illustration of the rule, were not those referred to amply sufficient for the purpose.

Were it not for the terms and conditions of the contracts as expressed in the rules of the board of trade, the case would be exceedingly simple and free from all difficulty. We presume all persons in the profession know that when, on the face of these agreements, the delivery of the wheat and the payment of the money were concurrent acts, to be performed by the parties at one and the same time, neither party could put the other in default without performing his part of the agreement, or offering to perform it. Had the time elapsed for performance, all know that appellees would have been compelled to tender the wheat, and appellants to have refused to receive and pay for it, before the former could have sued and recovered. Pars. on Cont. vol. 2, p. 189; 1 Chit. Pl. 351. This is illustrated by every well prepared precedent of a declaration on such contracts, whatever may be the form of action.

But the parties having incorporated the rules of the board of trade into their agreement, the question arises as to its effect on the contract. It in terms provides that, when either party shall be in default in putting up margins, after notice and within the next banking hour, the party calling for them shall thereupon have the right to consider the contract filled at the market value at the time of giving such notice, and all differences between such market value and the contract price shall be settled the same as though the time for fulfilling the

contract had fully expired. This, in terms, does not require an offer, or an ability or willingness to perform on either part. It only, in terms, requires a mental operation, unaccompanied with any physical act. Until the expiration of the hour, and for a period of time afterwards, the party claiming a default has, by the terms of the rule, the option to consider the contract filled or not, as he may choose.

Had the agreement required the party, before he exercised the option, to have made an offer, or at least have shown that he had the ability to fulfill his part of the agreement, and was willing to do so, then the contract would have conformed to legal principles; but, under the terms of this contract, appellees were not required to have a bushel of grain they could have delivered at the place of performance. It is true, the contract speaks of wheat "in store," but neither wheat nor warehouse receipts were offered, nor was it shown that appellees had any wheat in Chicago, and it could not have been in the contemplation of the parties to deliver or receive it elsewhere, or it would have been so stated in the contract. The use of the words, "in store," we understand to mean, that it was, at the time of delivery, to be in store in Chicago.

The fact that no wheat was offered or demanded, shows, we think, that neither party expected the delivery of any wheat, but, in case of default in keeping margins good, or even at the time for delivery, they only expected to settle the contract on the basis of differences, without either performing or offering to perform his part of the agreement; and if this was the agreement, it was only gaming on the price of wheat, and if such gambling transactions shall be permitted, it must eventually lead to what are called "corners," which engulf hundreds in utter ruin, derange and unsettle prices, and operate injuriously on the fair and legitimate trader in grain, as well as the producer, and are pernicious and highly demoralizing to the trade. A contract, to be thus settled, is no more than a bet on the price of grain during or at the end of a limited period. If the one party is not to deliver or the other to receive the grain, it is, in all but name, a gambling on the

price of the commodity, and the change of names never changes the quality or nature of things.

It has never been the policy of the law to encourage, or even sanction, gaming transactions, or such as are injurious to trade, or are immoral in their tendency; and the old maxim, that courts will always suppress new and subtile inventions in derogation of the common law (Branch's Principia, 71), would be applicable to such contracts. This seems to be a subtile invention to abrogate well established, fair and just principles of the law of contracts, and not only so, but to the great injury of fair and legitimate trade.

Here, there was surrendered to appellees the deposit of $2300, and the jury have found a verdict of $5700, making in all $8000 for compensation for damages sustained, when, so far as the evidence shows, appellees had no wheat they could have delivered, in fulfillment of the contract, nor does it appear that they ever expected to deliver a bushel under this contract. They do not show that they have lost a dime, or that they are liable to lose anything under this contract. Why, then, say appellees should recover this large sum? All know that it is a fundamental rule that a party can not recover more than a compensation equal to his loss by any injury he may have sustained, except where punitive damages are given.

There is no evidence that appellees had contracted for the wheat necessary to fill this contract, or had incurred the least expense towards its performance. Then, why allow them to recover this large sum of money? We know of no principle of justice that requires it more than that of any debt incurred without consideration to support it. It is true that appellees had put up their margins, and if, at the end of the time stipulated, the market had been against them, or if that had been the case before that time, and they had been in default, they would have lost it.

The statute has prohibited, under heavy penalties, the sale of wheat on called options to buy or sell grain, because of its pernicious tendency; but it seems to us that these contracts for the sale of grain, where neither party intends to perform

them, but simply to cancel them before or at their maturity, and pay differences, are as injurious to trade and fully as immoral as are the sales of options. Neither belongs to fair and legitimate trade.

It is claimed this wheat was again sold to ascertain the differences that should be paid. What wheat? it may be asked. There is no evidence that appellees had any wheat that could be delivered at the place of this contract. So far as we can see, the wheat only existed in imagination; and even this imaginary wheat may have already been sold a number of times before the imaginary fulfillment of the contract, which it is claimed put appellants in default. If the contract was for an actual sale, a delivery of the grain by warehouse receipts or otherwise, it would have been necessary to offer to perform, or at least shown a readiness to perform, to have placed appellants in default, and then the difference between the selling price and the contract price would have been the fair measure of damages.

Whilst the law has studiously fostered fair and legitimate trade, it has not sanctioned pernicious practices that are injurious to its votaries, and are demoralizing in their tendencies. Nor can it change the rule, that the contract may have been made in good faith, with an honest expectation that the wheat would be delivered and the money paid therefor, as the law is equally imperative that an offer, or at least a readiness, to perform must be shown by the party seeking to put the other in default. But when they, by the agreement, dispense with a performance, or at least an offer, or readiness to perform, then they render the contract obnoxious to the law of contracts. *Pickering* v. *Cease,* 79 Ill. 328. It is this effort which stamps it as being in the nature of a gaming contract. It is this effort which characterizes the transaction, and renders it illegal.

We are aware that there are cases which hold that a party may be excused by the default of the other, in the performance of a precedent act, from proving an offer or a readiness to perform on his part, before declaring the contract at an end. Nor is it claimed that, when appellants failed to put up further

margins, appellees might not have rescinded the contract by notifying appellants that it was at an end. The contract, on its face, was for the sale and delivery of wheat, at a specified price, within a given time; and there was a further agreement contained in the rules of the board of trade, that the parties would put up margins, each to secure the other in the performance of the contract.

Then, when this latter agreement was not performed by appellants, what resulted as a legal consequence? Why, manifestly the damage, only, resulting from a failure to comply with its requirement. It was not for a failure to receive the grain on an offer, or a readiness to deliver. And in such a case, what may be recovered? Surely nothing more than the damages sustained by appellees. And what were the damages sustained? The proof shows they were nothing, as appellees had no wheat that could be delivered in fulfillment of the contract. An agreement to perform several acts at different times, does not authorize a party to recover for a breach of all because the other party has refused to perform the first in the series.

Suppose an owner of a lot of ground were to contract with a builder to furnish all the materials and labor, and construct for him a house on the lot; and suppose the agreement provided that the builder should commence the work at once, and complete the structure within twelve months, and the owner was bound to pay therefor $20,000, in equal monthly installments; and the builder should enter upon the performance of the contract, and expend $1000 in materials and labor, and the owner should make default in the payment of the first installment. Does any one suppose that the builder could, even if the agreement so provided, treat the contract as filled by him, and sue for and recover the $20,000? We apprehend that no one would contend that he could.

Again, suppose there should be added to such an agreement a provision that, if the builder should make default, the owner might treat the contract as fully performed by him, does any one imagine, on the default of the builder, that the owner could sue for and recover of the builder, as though he had

paid him in advance, the $20,000, although he had not paid a dollar on the contract? We presume no one could say it would be legal or just to permit such a recovery.

Or suppose, in such a contract, it should be agreed that the builder should furnish the materials, for which the owner should pay him, and if the owner should make default, that he should pay for all increase in their value; and suppose that, from some sudden and unexpected emergency, building materials should advance fifty per cent, would any one suppose that he could, on the default of the owner, sue him and recover the rise in their value, we will suppose $5000 or $6000, when he did not have on hand any such material, and had contracted for none, nor expended anything therefor? We apprehend that all fair-minded men would say it would be unjust and oppressive in the extreme.

In the cases supposed, such has never been held to be the measure of recovery, and it seems to be obvious that the parties could not contract for such a measure of damages. It would shock the sense of justice of all right-thinking persons, and such a rule would be monstrous. All must concede, in the cases supposed, that a recovery for the labor already performed, and money expended, together with such proximate damages as the party not in default had actually sustained, would be the limit of the recovery, because that would be the injury sustained. Then the recovery would not be the sum due on the fulfillment of the contract by either party, but the amount of damages sustained by the breach of the precedent clause of the agreement.

In the cases supposed, an action could not be maintained on an averment that the party not in default had fulfilled his part of the contract, although it might have stipulated he might treat it as fulfilled, but, to recover, the action would be on the breach of the precedent clause of the agreement. And this is the extent of the cases which hold that, on the breach of a precedent clause of the agreement by one of the parties, the other may terminate the contract and sue for and recover damages, without waiting for the expiration of the time for the

fulfillment of the agreement, or offering or showing a readiness to perform his part of the contract. And in such case, the party not in default may recover all damages growing out of the breach of the precedent part of the agreement, and not to the same extent that he could, had he performed in full his part of the agreement, and the other had not performed his part.

We fail to perceive any difference in principle between the supposed cases and the one at bar. It may be that, had the declaration counted alone for a breach of the agreement to put up margins, and appellees had proved that they had sustained damage, by having wheat on hand to deliver, or wheat actually purchased to be delivered on the contract, and on which they had sustained loss, the amount of such loss might have been recovered; but no such loss is shown.

There is another class of cases which hold that the contracting parties may fix a measure of damages which either shall pay, who shall make default. But, to be legal, the sum thus agreed to be paid as liquidated damages must be reasonable, and not oppressive. If the sum thus fixed is highly penal, and unjustly oppressive, courts of justice should never enforce the payment of such exorbitant sums. Courts must treat such unjust and oppressive agreements as penalties, and refuse to enforce them.

In all penal bonds there is a positive agreement to pay the sum named, if the obligor shall fail to perform the annexed condition; and yet, all know the penalty can not be collected, but only the actual damages sustained by the breach of the condition. If the damages proved equal the sum named in the bond, the recovery may be to that extent, but the recovery is for the damages, and not the penalty. In this case the conditions contained in the rules of the board of trade, if to be enforced as claimed, are highly penal, as is illustrated by the recovery below—so much so as not to be enforced.

Another view may be taken of this contract. We have seen that, in case of a failure to put up margins as required, the party demanding them may elect to consider the contract as

44      LYON & CO. v. CULBERTSON, BLAIR & CO. [Sept. T.

Opinion of the Court.

filled, and the settlement shall then be based on the difference between the contract price and the market price when the default is made.

It would by no means be a forced construction, to say this contract means that, when the party elects to regard the contract as filled, if he desires to do more than to simply declare the contract at an end—if he desires to hold the other party liable for damages—he must do all things that would have been required of him in case the time for the delivery had elapsed. Had the time for delivery by one party, and payment by the other, arrived, by the terms of the contract, appellee would, it may be held, have been compelled to have tendered the wheat or warehouse receipts before they could have put appellants in default, so as to recover damages for a breach of contract. And the agreement gave the sellers the option to fix the day of delivery, and the right thereupon to demand payment, so it should be within the period limited by the contract.

If such was the effect of the terms of this contract, then appellees had the right to, and were required to offer the grain, whenever they elected to treat the time as having arrived for the fulfillment of the agreement. If they elected, on the 20th of August, to treat the time as having arrived, when they would fill the contract, they should have done so precisely as though the last day had arrived within which they could make a delivery and demand payment. With this construction, appellees were bound to offer the wheat or warehouse receipts therefor, and hence, they having failed to make such an offer, they have failed to show themselves entitled to recover.

We have examined with great care the able and exhaustive argument of appellees' counsel filed on a petition for a rehearing, but are constrained to adhere to the conclusion heretofore announced, but have modified in some respects the views heretofore expressed.

For the reasons herein expressed, the judgment of the court below must be reversed and the cause remanded.

*Judgment reversed.*

Mr. JUSTICE DICKEY, dissenting:

My convictions compel me to dissent from the conclusions of my brethren in this case.

It may well be that a contract for the sale of grain at a future day, at a given price, in which is found an unconditional agreement that no grain shall be delivered or demanded, and no price shall be paid, but that, in lieu thereof, the difference, on the day named for the sale, between the contract price and the market price, shall be paid by the seller if the contract price be the lower, and by the buyer if the contract price be the higher, should be held a mere gaming contract, and for that reason void, and that. too, if such were the real intention of the parties, no matter under what form or device such intention might be attempted to be concealed.

But, in my humble judgment, that is not this case. The contracts do not so provide, upon their face. There is, in my judgment, no fact or proof in the record tending to show such vicious intention, and the fact that Culbertson, Blair & Co. did purchase and ship for Chicago 15,000 bushels of wheat, and did bargain, in Chicago, for other wheat, in all sufficient to fill all these contracts, tends strongly to show affirmatively that the contracts were made in good faith, with the honest expectation that the wheat contracted for would be delivered, received and paid for, in full execution of the contracts. The jury have so found, under special instructions on that very point, and no ground is perceived for questioning the truth of the verdict.

In the opinion delivered in this case, the court say: "The fact no wheat was offered or demanded, shows, we think, that neither party expected the delivery of any wheat, but, *     *. at the time of delivery, they only expected to settle the contract on the basis of differences." In my judgment, no such inference can be drawn from the mere failure to offer to deliver, for, in the meantime, appellees had, by the default of appellants, been released from the duty to deliver; nor can such inference be drawn from the failure to demand the wheat, be-

cause, in the meantime, by the change in the market, appellant did not want it at the contract price. This is the only reason assigned in the opinion in support of the position. The verdict, in my judgment, can not properly be disturbed upon that ground.

The case is not, however, made to turn on this position, but two other grounds are taken, and, unless the views of the court are not properly apprehended, they may be stated as follows: 1st. Assuming these contracts to be valid, the plaintiffs can not recover without proving, on their part, an offer, or at least a readiness to deliver the wheat, and receive the price. 2d. that the contracts are void upon their face, because of the attempt therein shown to dispense with delivery.

It seems to me that both of these propositions are unsound, and that the court has been led to approve them by failing to notice and give full effect to a very important feature of these contracts. They provide, as a fundamental condition precedent, that each party shall, on demand, *give to the other security*, and all the *subsequent acts* required by the provisions of the contracts are *dependent* upon the performance of this condition precedent. In the opinion of the court under consideration, it is laid down as the *imperative* demand of the law, in *all* cases of contracts for the sale and delivery of property at a future day, to be paid for on delivery, that the seller, to put the buyer at fault and subject him to liability, must show an offer, or at least *a readiness* to deliver the property. This undoubtedly is the rule, unless the buyer has already been put at fault, in some other way. There are many other ways in which the buyer may be put at fault. Where the buyer has released or excused the seller from the obligation to perform the contract, proof of an offer or readiness on the part of the seller is dispensed with.

In *Risinger et al.* v. *Cheney*, 2 Gilman, 90, this court said: "The law is well settled, that he who prevents or dispenses with the performance of a condition, can not take advantage of the non-performance."

Mr. Justice Dickey, dissenting.

A failure of one party to perform a condition precedent, will release the other party from the performance of a subsequent condition to be by him performed, when the subsequent condition is, by the contract, dependent upon the former. In the case now under consideration, by the contract, appellees were not bound to deliver the wheat, unless the security agreed upon was given when demanded. Proof of their failure to do this dispensed with proof of readiness and an offer to deliver.

In *Kingston* v. *Preston*, (cited in 2 Douglas, 690,) Lord Mansfield said: "There are covenants which are conditions dependent on each other, in which the performance of one depends upon the performance of the other, and therefore, till the prior condition be performed, the other party is not liable to an action on his covenant. (1 Chitty's Pl. 321.) In this case, after the closing of the contracts by Culbertson, Blair & Co.. for want of the required deposits, had Lyon & Co., on the last day of August, demanded the wheat of the sellers, and offered to pay the contract price, and had the sellers failed to deliver, and had Lyon & Co. sued for the failure to deliver, they could not have recovered; because, by reason of their own failure to keep their margins good, Culbertson, Blair & Co. were no longer bound to procure and deliver the wheat. Under my conception of the contracts, the undertakings to make the necessary deposits for security, were conditions precedent, on which the undertakings, on the one hand, to deliver, and on the other to pay, were dependent.

In the case of *Kingston* v. *Preston, supra,* Preston had agreed, among other things, with Kingston, that, at a given time, he would, on certain terms to be performed at the same time, among which was the making of certain deeds, give up to Preston and another his stock in trade as a silkmercer, at a fair valuation; and Kingston, on his part, among other things, had agreed to accept the stock at a fair valuation, and to execute the deeds mentioned; and further, that he would, at and *before* the delivery of the deeds, "*cause* and *procure good* and *sufficient security*" to be given to Preston, to be approved by him, for the payment of £250 monthly to Preston, in lieu

of a moiety of the monthly produce of the stock in trade. Kingston was ready, and in apt time offered to perform his part of the concurrent acts in the agreement in every respect, but he had neither offered nor given *sufficient security* for the payment of the £250 monthly. The court held that the giving of the security, although mentioned in the latter part of the agreement, was a condition precedent, on which the promise of Preston to turn over his stock was dependent, and that the failure on the part of Kingston to give the necessary security, released Preston from his obligation to go on with the performance of the subsequent terms of the agreement, that the one would deliver and the other receive the goods.

On the same principle, in the case now under consideration, the failure of Lyon & Co. to give the security agreed upon, when demanded, released Culbertson, Blair & Co. from their promise to sell and deliver the wheat. The law surely can not imperatively demand that they should offer to do that which, by law, and the terms of their contract, it was not their duty to do.

Story says: "If the promisor be prevented from performing his contract by the act of the promisee, he will be *discharged* from liability for non-performance." Appellees, having promised to sell and deliver this wheat, before they could recover of appellants for a failure to buy, must perform or offer to perform the act of delivery; but if they were prevented from delivering or offering to deliver, by the act of the promisees, in failing to give security, the appellees are discharged from their liability for not delivering.

Mr. Justice CATON, delivering the opinion of this court in *Palm et al.* v. *The Ohio and Mississippi Railroad Co.* 18 Ill. 320, said: "Where an act which the defendant is bound to do is, by the terms of the contract, made a condition precedent to the performance (of another act) by the plaintiff, (either in the nature of things, or evidently in the contemplation of the parties at the time the contract was entered into,) then the failure to do the act does, of itself, prevent the other party from performing, as much as if he were forbidden to perform

it." Apply this doctrine to this case, and it is found that, by the express terms of the contract, and from the nature of things, the putting up of the margins necessary for security was to be a condition precedent, in want of which the plaintiffs below should not be required to perform the subsequent condition of delivering the wheat.

In case of a contract for the sale and delivery of grain or other personal property at a future day, to be paid for on delivery, if the buyer, prior to the time of delivery, informs the seller that he will not accept the property, this is a waiver of the necessity of a tender of the property by the seller, and if the declaration be not withdrawn when the time arrives for the delivery, it will constitute a sufficient excuse for not offering to deliver, and, in such case, the seller may recover, without proof of a readiness or an offer to deliver. This doctrine has been repeatedly laid down by this court. It is distinctly laid down in the opinion of the court, by Mr. Justice Breese, in *McPherson* v. *Walker*, 40 Ill. 372. The same, in principle, is decided in *Wolf* v. *Willitts*, 35 Ill. 95, 102.

Again, it was held by this court, in *Chamber of Commerce* v. *Sollitt*, 43 Ill. 523, that "if one party to an executory contract induces the other to believe that he has withdrawn from his contract, the other contracting party need not wait until the day of performance before making new arrangements, *nor does he lose* his remedy against the delinquent party, by providing at once against losses likely to arise from such delinquency." Can it be said that appellees lost their remedy against appellants, by not going on with these contracts, after appellants, by their failure to make the required deposits, had induced appellees to believe that they had withdrawn from these contracts?

In *Fox* v. *Kitton*, 19 Ill. 533, it is said by this court, that "where a party, agreeing to do an act at a future day, and before the day arrives declares he will not keep his contract, the other party may act on the declaration and bring an action even before the day arrives;" and the case of *Hockster* v. *DeLatour*, 20 Eng. L. and Eq. Rep. 157, is there referred to

4—83d Ill.

with approbation.   Can it be denied that in this case appellants, before the day for the delivery of the wheat by appellees had arrived, not only declared by their default that they would not keep their contract, but actually refused and failed to keep it?   If the mere declaration of one party, that he will not perform a concurrent act, will release the other from performing or offering to perform the corresponding concurrent act, surely the failure to perform a condition precedent, by one party, absolves the other from such subsequent performance or offer to perform.   The case, *supra*, of *Hockster* v. *De Latoure*, goes, perhaps, further on this point than any other.   Under the contracts under consideration, there was no need, after the failure of appellants to make good their margins, that appellees should show either a readiness or willingness, or an offer to perform; for, after the failure to give the security, they were absolved from all obligation to put themselves in a position of readiness to deliver the wheat, and are entitled to compensatory damages —the damages which they have actually suffered from the failure of appellees to perform this condition precedent—not the full contract price of the grain as if actually delivered, which would have been in this case near $32,000, but the difference between that amount and what the appellants could, at that time, get in the market for the grain, which was about $8000. It is not material at what price appellants had contracted for grain to fill this contract, nor is it material whether or not they actually sold this grain for less than they gave for it, nor whether, in that sense, they actually lost a dime or not.   They were, by their contract, entitled to the profits which would have resulted to them from a full performance.   These were taken from them by the default of appellees.   These they recovered in this case.   The damages allowed them are merely compensatory, according to the usual rules of law and the principles of common justice, and are in no sense penal.

Are these contracts void, *per se*, upon their face, because they expressly provide, that in case of failure to give the security required, no delivery or offer to deliver need be made?   Had there been in these contracts no such express provision, it is

plain, from the authorities already cited, that the relations and liabilities of the parties would have been the same precisely as is provided by these rules of the board of trade. I can not believe that contracts are made void by expressly declaring therein that which the law would have implied had the contract been silent on the point.

What are these contracts, in substance, when stripped of their mere forms? Take, as an example, that bearing date August 14, 1872, and made personally between these parties, a copy of which is set out in the opinion of the court in this case.

Culbertson, Blair & Co. agree, first, that they will sell and deliver in store in Chicago, to Lyon & Co., 10,000 bushels of No. 2 spring wheat, in lots of 5000 bushels, on some day in that month, to be chosen by the seller; and Lyon & Co. agree, that when the wheat is so ready and offered to them, they will receive the same and pay for it at the rate of $1.57$\frac{1}{2}$ per bushel. The parties agree, each with the other, second, that on demand made by the other, at any time before the performance of the foregoing provisions, they will give to the other the security mentioned in the rules of the board of trade, by depositing, from time to time, the required margins. And they agree, third, that if either party shall fail to comply with the second part of the bargain, the other shall be absolved from the performance, on his behalf, of the first part of the agreement, and that the other party shall pay to him damages, equal to the difference at the time of the default, between the market price of the wheat and the contract price.

It is not denied that, had the contract consisted merely of the first branch of this contract, it would have been a valid contract, the breach of which would, by law, have incurred damages to the amount of the difference between the market and contract price. It can not be denied, that under that contract the seller might have been released from his obligation to deliver or offer to deliver, by the act of the buyer, as I have shown by authority. It will not be contended that the addition of the second part of the agreement rendered the contract invalid. It was competent for the parties to contract with

each other to give security in the mode pointed out. Had the contract, then, contained only the first and second parts of the agreement, it would have been valid; and it is apprehended that in such case had the buyer broken his promise to give security—which in its nature was a condition precedent—it would have been a breach of the contract, for which he would have been liable to damages, and that, in such case, no proof of an offer to deliver would have been necessary to sustain the action; and in such case, the measure of damages would, by law, have been the difference between the market price and the contract price at the time of the breach of the contract by the buyer. Had the contract, then, been silent about dispensing with an offer to deliver, and had only contained the first and second parts of this agreement, and also a clause that the measure of damages, in case of a failure to give security, should be the difference between the market and the contract price, there could be no doubt on that question, for the measure of damages which the law allows are those which flow immediately from the wrong, and which the parties are supposed to have contemplated when they contracted; and not only so, but it has been repeatedly held by this court, that the parties may lawfully agree upon the rule of damages, or on a particular amount as liquidated damages, and that such contracts are valid. *Tiernan* v. *Hinman*, 16 Ill. 401; *Low* v. *Nolte*, ibid. 475; and *Peine* v. *Weber*, 47 Ill. 41.

If it be true, that in the absence of the clause in this contract which attempts to dispense with a delivery, the legal effect of the contract would be precisely the same as is in that clause declared, the addition of the clause can have no effect upon its validity. The addition of that clause neither adds to nor takes from the legal effect of the contract in question. Yet the court say, in relation to this contract, "but when they, by the agreement, dispense with a performance, or at least an offer or readiness to perform, then they render the contract obnoxious to the law of contracts. It is *this effort* which stamps it as being in the nature of a gaming contract. It is this effort which characterizes the transaction and renders it illegal."

It seems to me this contract does not dispense or attempt to dispense with performance or an offer to perform. It demands, in performance, that the security, in the shape of deposits, shall be made; and it demands, that if this be done, the grain shall be ready, and be delivered or offered, and it demands, if this be done, that it shall be received and paid for. It is apprehended that what is meant here is, that the contract attempts to dispense with that part of the performance which was to consist in the delivery of the grain. I have tried to show that this is not dispensed with, but is merely made to depend upon a condition precedent, to be first performed by the buyer.

It is not denied by me, that were the condition precedent a mere trifle, of no importance to either of the parties, the court might well say that, upon its face, it is a mere trick. Had this contract, instead of the deposits required as security, provided that either party might, at any time pending the contract, demand of the other a grain of corn, and upon failure to receive it might declare the contract at an end—and in such case no offer to deliver should be necessary—the judgment of the court might well be, that this was, in substance, attempting to dispense altogether with the performance of the contract, and that it was a mere bet upon the future price of grain, a mere traffic in differences, and, as such, void. But my sanction can not be given to the doctrine, that a contract for the future sale and delivery of personal property can, under no circumstances, be valid, which provides for a contingency, on the happening of which the vendor need not offer to deliver. Parties have the lawful right to contract for the performance of a condition precedent which may be to their interest to have performed. The condition precedent in this contract is one of substance and importance, and is reasonable.

In a large city the competition in the trade in grain, which tends to secure to the producer an active market for his products, can not so well be maintained unless dealers can safely make bargains with others with whom they are but slightly acquainted, if at all, and that, too, without the trouble and time of inquiring as to their pecuniary responsibility, and without the risk of their insolvency. This is accomplished by the use of these rules of the board of trade, which are expressly incorporated into these

contracts. The provisions are not trifles. They relate to matter which every dealer knows to be a matter of substance. The security required, in reason, goes to the foundation of the whole transaction. There is nothing immoral in providing for such security, nor in demanding that it be furnished.

It is not perceived how the addition of the last clause of the contract, or of the last two clauses of the contract, stamps it as a gaming contract. In all cases where property, whether real or personal, is bought—whether for cash or on time—for mere purposes of speculation—for the mere purpose of future sale in expectation of profit, and not for use of the purchaser— the transaction partakes more or less of the nature of a bet upon the future market value of the property so bought, and in that sense such contract is a gambling contract. Such contracts are. however, upheld by the courts, both at law and in equity. It partakes of the nature of a bet, just in so far as the purchaser takes the risk of the market value going up or going down. It neither adds to nor detracts from this risk to provide, in a contract for future purchase, that. security shall be given by the parties. Nor does it add to this risk to provide, that on failure to give the security by one party, the other need not offer to perform subsequent undertakings by him. It is only when, by the terms of the contract, *all acts of performance* are dispensed with, that such contract, on its face, ceases to be a valid grain contract and becomes a mere bet on the market, or a dealing in differences. The bet, if any, is contained in the first part of this contract. It is there the risk comes in. It does not invalidate a contract that it contains this risk, if it contains other substantial elements of legitimate trade, although it may be for speculation only. When, however, the other provisions of such a contract completely eliminate and take from such contract all the other substantial elements of trade, nothing is left but the risk as to the market, and in such case the contract, in law. is a mere bet. It has been shown. it seems to me, that the provisions found in these contracts, for giving security, and the provision for delivery and payment in case the security is given, take these contracts clear out of the domain of mere gambling.