448        `L. S. & M. S. Ry. Co. v. Richards.

The Lake Shore and Michigan Southern Railway Company

v.

Edward S. Richards.

*Filed at Ottawa November 15, 1888.*

1. Contract—*in respect to weighing and transferring grain for ship-ment—contract construed as to relative rights of weigher and carrier—as to the use to be made of the weights furnished.* The inventor and owner of a patent for a new device for weighing and transferring grain in cars, entered into a contract with a railway company, under which he erected the necessary buildings, etc., upon land leased to him by the company, and by which contract he was to weigh grain transferred to the company for shipment, without charge to the latter, except one-half of any saving of expense over the former mode of weighing and transferring. The patentee was to have the right to charge the owners of grain such fees as might be agreed upon between him and them, for weighing and transferring, and it was provided that the railway company was to make no use of the weights given it, for any other purpose than billing the grain to its destination. It appeared that the weights so furnished had a market value of seventy cents per car-load of grain, and that the company, in violation of the contract, gave the weights so obtained, to connecting roads, and thereby prevented the patentee from selling them: *Held,* that the company was liable to him for the value of such weights so given to other companies, or, seventy cents on each car-load of grain.

2. The contract provided that the weigher should "receive, weigh and transfer all products contemplated by this agreement, which may be delivered to his said transfer-house by or under the direction of" the company. The preamble of the contract provided, that one of its ob-jects was "to provide a cheaper method of transferring grain," and for this purpose to use the device of the second party. There was a cove-nant that "if said second party shall fail to transfer as fast as required, the said first party may transfer by such other method as it deems proper." Another covenant provided that an additional building should be erected "to meet all the necessities of the party of the first part:" *Held,* that under this contract the party of the second part was to have all the weighing and transferring which it was in the power of the company to give, to the extent of the capacity of his building and appliances.

3. Same—*custom—as controlling the effect to be given to a contract.* It will not be presumed that parties make their contract with a view to a particular usage of trade, when they exclude the presumption by the

terms of their contract, or where it is shown they had no knowledge of such custom.

4. So where a railway company contracted with a party to weigh and transfer grain shipped to it from the west to be sent eastward, and it was expressly agreed that the company should make no use of the weights furnished it by the weigher, for any other purpose than billing the grain to its eastern destination, the weigher reserving the right to sell the weights to the original shippers and owners, it was *held*, that even if there was, at the time of making the contract, a custom for the railway company to furnish the western roads with the weights of the grain when ascertained, it was excluded by the express terms of the contract limiting the use of the weights to the purpose of billing the grain to the east.

5. Same—*measure of damages, when one party is prevented by the other from performing.* The inventor of a new method of weighing grain in cars and transferring the same, under a contract with a railway company for the exclusive right to weigh and transfer grain sent to and forwarded by the latter, erected the necessary buildings and appliances to enable him to perform the duties assumed, and while engaged in such weighing and transferring, the buildings used by him for that purpose were injured through the fault of the servants of the company, and while they were unfit for use, by reason of such injury, several hundred cars of grain were transferred and weighed by other means and agencies: *Held*, that the inventor was entitled to receive the compensation provided in the contract for the weighing and transferring of the grain in such case weighed and transferred by other means, he having been prevented from performing that service through the fault of the railway company.

Appeal from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. Gwynn Garnett, Judge, presiding.

Mr. Pliny B. Smith, for the appellant:

The court erred in finding that defendant should pay for the weights given to western railroads, irrespective of whether complainants were damnified by such action or not.

The parties must be presumed to have contracted with reference to the universal custom of doing business among the railroads in Cook county. *Insurance Co.* v. *Favorite*, 46 Ill. 263; *Lonergan* v. *Stewart*, 55 id. 44; *Insurance Co.* v. *Advance*

*Co.* 80 id. 549; *Lyon* v. *Culbertson*, 83 id. 33; *Oldershaw* v. *Knoles*, 4 Bradw. 63; *Mida* v. *Geissman*, 17 id. 207.

If a breach of the contract was shown, the rule of damages adopted was not correct. A party can recover only such sum as he shows he has been damaged. 1 Sutherland on Damages, 17, 18, 130, 74; Sedgwick on Damages, 33, 36, note 3; *Wicker* v. *Hoppock*, 6 Wall. 94; *Burckhardt* v. *Burckhardt*, 36 Ohio St. 261; *Morehead* v. *Hyde*, 38 Iowa, 382.

The court erred in finding that complainants were entitled to transfer and weigh all grain transferred by defendant in Cook county, and that defendant was liable to pay complainant for all products transferred by it otherwise than through his house. *Burton* v. *Railway Co.* 9 Exch. 507.

Messrs. Smith & Pence, for the appellee:

The court did not err in finding that defendant should pay for the weights furnished to western railways. The court did not find that defendant should pay for such weights, irrespective of whether complainant was damnified. The western railways having received these weights, which are the property of appellee, through the wrongful act of appellant, the appellant is estopped from asserting that such railways would not have bought them from appellant, and the market price of such weights in Chicago, where such property was converted, being seventy cents per car, the appellant will be charged such market price in Chicago. *Armory* v. *Delamirie*, 1 Strange, 504; 1 Smith's Lead. Cas. *471; *Wilson* v. *Railway Co.* L. R. 9 Ch. App. 283; *Curry* v. *Wilson*, 48 Ala. 638; *Hart* v. *Ten Eyck*, 2 Johns. Ch. 108.

Appellee was entitled to transfer and weigh all grain and seed transferred from cars of western railways to the cars of appellant.

Mr. William A. Gardner, also for the appellee.

Mr. Justice Magruder delivered the opinion of the Court:

This is a bill, filed on June 5, 1886, in the Superior Court of Cook County by Edward S. Richards and John W. Maynard, then composing the firm of Richards, Maynard & Co., against the Lake Shore and Michigan Southern Railway Company, for an accounting and for the reformation of a contract. The cause was referred to a master in chancery, who took evidence and stated the account, finding that there was due from the defendant to the complainants the sum of $9686.68. The trial court refused to reform the contract, but confirmed the Master's report as to the amount due, and decreed a recovery of said amount against the appellant company. This decree has been affirmed by the Appellate Court and is brought here by appeal from the latter court. After the cause reached the Appellate Court, Maynard died, and, upon suggestion of his death, leave was granted to Richards to prosecute this appeal, as surviving partner.

Large quantities of grain, brought to Chicago from the west, and designed, either before or after its arrival in that city, for transportation to the east, is delivered in the cars by the western to the eastern railroads, and by the latter is weighed and transferred from the western to eastern cars. The work of transferring had formerly been done by placing the loaded and empty cars side by side on parallel tracks and shoveling the grain from one to the other by hand. The weighing had been done on track scales, by first weighing the loaded car and then weighing the car after the grain was removed, the difference between the two weights constituting the net weight of the grain. This process was expensive, and, owing to various causes, the weights thus obtained were not strictly accurate.

The appellee Richards was the inventor and patentee of a new process for weighing and transferring grain, which was claimed to be cheaper than the old method, and which did, in fact, furnish more accurate weights than could be had under

the former system. By this new device, loaded cars of grain were shoved up upon an elevated track in a transfer house, and corresponding empty cars were placed on a track in the house below the loaded ones. The grain was then shoveled by steam shovels from the cars into hoppers, where it was weighed, and then allowed to run by force of gravity to the lower cars.

Negotiations were entered into between appellee and the appellant company with a view to the adoption by the latter of the former's invention. These negotiations resulted in a written contract, dated January 2, 1884, between the Railroad Company, as party of the first part, and Richards, as party of the second part, which contract was afterwards assigned to the firm of Richards, Maynard & Co. By the terms of this agreement the Railroad Company leased to Richards for ten years at a nominal rent a piece of ground, upon which he was to erect the necessary transfer house and the approaches thereto and the hopper scales, and the company was to build and maintain on the approaches and through the house the necessary tracks, and to do all switching of loaded and empty cars to and from the transfer house at its own expense, provided that the actual cost thereof should be taken into account in determining the fair amount to be paid to the second party as provided in covenant third, hereinafter mentioned, of the first party. Richards agreed to receive, weigh and transfer all grain, seed, etc., which might be delivered to his transfer house by the company, with promptness and dispatch, etc.

Appellee built the transfer house, with the scales and attachments, etc., at a cost of over $20,000.00. It was completed by June 24, 1884, and business was done in it under the contract from that date up to June 16, 1886. The controversy between the parties arises out of this contract and out of the transactions under it. It is very lengthy, and only those provisions will be noticed, which are material to the determination of the points in dispute.

Covenant "third" of the first party is as follows:

"*Third*—Said first party further covenants and agrees that in case there shall be any saving to it, in the switching, weighing and transferring of products, in this agreement referred to, through the methods and devices adopted by said second party, over and above the actual cost of doing the same work under the ways and methods now in use by said first party, then and in that event, it will pay to second party one-half of said saving, the just and actual amount thereof to be ascertained and determined as provided in covenant 'first' of 'mutual covenants,' said amounts if found due, to be paid to said second party on or before the middle of each month, for the month preceding."

Covenants "third" and "fourth" of the "mutual covenants" are as follows:

"*Third*—And it is further mutually covenanted and agreed, that all shipments originating at points west of Chicago, and properly billed through to eastern points, and requiring transfer through said house, shall be classed 'through shipments,' and be transferred in the same manner as re-consigned property, and upon the same basis of cost to said first party. It being specially understood and agreed, that under no circumstances is said first party to be charged for weights upon any transfers made through this house; but nothing in this agreement contained, shall be so construed as to prevent said second party from charging such fees as may be agreed upon between him and the owner of the property delivered for weights and transfer, and for such other service as he may render in connection therewith, and for collecting his charges as provided in following mutual covenant.

"*Fourth*—It is further mutually understood and agreed, that said second party is to receive his compensation for his time, labor and investments employed in building, operating, and maintaining said transfer house, entirely from the weighing of property passing through it, and from the owners thereof,

and not from said first party, except as provided in covenant 'third' of said first party; and said first party shall not make use of the weights obtained from said second party in the conduct of its business, for any other purpose than billing the property to destination, but upon request of said second party, said first party will collect such weighing charges as he may show are due to him, in the same manner as other advanced charges are collected, and pay the amount so collected to said second party on or before the middle of each and every month."

The first objection made by appellant to the decree of the court below is that the defendant is required to pay for the weights given to western railroads. The Master, in his report, found that "weights were given to Western Railroads on 12357 cars, for which said defendant was to pay to said complainants at the rate of 70 cents per car making the sum of $8649.90," and this finding was confirmed by the decree of the chancellor. The fact, that the defendant below did give the weights on 12357 cars to western railroads, is not disputed. Clearly, this was a violation of the contract.

In the fourth "mutual covenant," the defendant agreed that it would "not make use of the weights obtained from said second party in the conduct of its business for any other purpose than *billing the property to destination.*" The defendant carried the grain in its cars eastward from Chicago. If it had the exact weight of the grain in each car, it could figure therefrom the amount of freight to be stated in the bill of lading and to be collected at the end of the route. Richards was willing that the Company should use the weights in billing from Chicago to the eastern destination, because it needed such weights in order to fix its own compensation for carrying the grain. But he expressly provided that the company should make no *other* use of such weights. Why? Because, by the terms of the fourth "mutual covenant," he was "to receive his compensation for his time, labor and investments employed in building, operating and maintaining said transfer-house entirely *from the*

*weighing of property passing through it,*" etc., except that, if, by
his method of weighing and transferring grain, there was any
saving over and above the cost under the old method, the com-
pany was to pay him one half of such saving, as provided in
the third covenant of the first party. His business was weigh-
ing and selling weights to grain receivers, shippers, owners,
commission merchants and other consignees.

If appellant, having received these weights from Richards
for the sole purpose of billing the grain to its eastern destina-
tion, could use them in any way it saw fit, then it had the
power to virtually destroy the business of appellee and stop
the source of his income. What did appellant do?

The evidence and the language of the third mutual cove-
nant show, that there was a distinction between "through ship-
ments" and "re-consigned property." As we understand it,
"re-consigned" grain was grain, that had been shipped from
western points over western roads to commission merchants or
consignees in Chicago. When originally shipped, it was not
intended to be sent any further than Chicago. But, upon
arriving in Chicago, it would be sold upon the track by com-
mission men to eastern and foreign parties, who desired to have
it sent forward without being put into the elevators in Chicago.
In such cases, where it was to go eastward over appellant's
road, it would be transferred from the western cars, in which
it arrived at Chicago, to appellant's cars through the transfer-
house. The original shippers of this grain from the initial
points in the west, and the western roads, over which it was
shipped, had no accurate weights of the grain and expected to
get such weights in Chicago. The original shipper wanted
exact weights so as to know how much freight he should pay,
and the western railroad, or road bringing the grain from
points west of Chicago, wanted exact weights so as to know
how much freight to charge. It was the business of appellee
to furnish these weights and make a charge for so doing. The
appellant, however, in violation of its agreement, when pos-

sessed of these weights for a particular purpose named in the contract, gave them away to the western roads and thereby prevented appellee from selling them.

The President of the appellant company, with great candor and frankness, admits, not only that these weights were given to the western roads, but that the employees of his company violated the contract in so doing. His testimony is as follows:

"I do not remember how long a time after the making of the contract it was that the knowledge of complainants' weights being given to western roads came to me. I think I first learned it from Richards himself. I think he complained to me that our people were giving these weights to western roads. When I acquired that knowledge, I directed that western roads be not furnished with exact weights."

Appellant claims, that, before the appellee's new method of weighing and transferring grain was adopted, it was the custom to furnish to the western roads the weights ascertained by appellant under the old method formerly in use, and that the parties must be considered to have made their contract with reference to such custom. That neither party had such custom in view, when they made the contract, appears from the fact that neither Richards nor the President of the appellant company had any knowledge of such custom at that time. The latter says: "At the time that the contract was made, I did not know that this company was in the habit of giving such weights to western roads."

But whether the custom contended for existed or not, it can not be set up to vary the terms of the express contract that appellant was only to make use of the weights for one purpose. It will not be presumed that parties contract with a view to a particular usage of trade, where they exclude the presumption by their contract, as has been done in this case. *Lyon* v. *Culbertson*, 83 Ill. 33; *Lonergan* v. *Stewart*, 55 id. 44.

A fair construction of the different clauses of the contract and of the evidence in the record shows, that the appellee's

firm had an exclusive right to these weights and a special property in them.

The testimony also shows that the market value of the weights was seventy cents per car. Appellant, having wrongfully deprived appellee of the opportunity of selling the weights, is properly chargeable with their market value. Upon this subject appellee testifies as follows:

"There was a market value for weights according to my system, in Chicago. Whilst I was carrying on business for the Michigan Southern railway we sold weights in the market in Chicago. As to the manner of sale, the matter was settled by a meeting of the Grain Receivers and Shippers Association, which I believe was held in August, 1884. There was a resolution passed by the association, whereby they agreed to accept our weights as final between buyer and seller, and pay us at the rate of seventy cents per car, the buyer paying one-half of the fee, and the seller the other, for which pay we rendered the weights."

The resolution, here referred to, is in evidence. For the reasons thus indicated we think that there was no error in requiring appellant to pay for the weights at the rate of 70 cents per car.

The second objection to the decree is the allowance of an item of $287.86 against the appellant. In the interlocutory decree, referring the cause to the master, the court found that in July, 1885, the transfer house was so damaged by the negligence of the appellant's servants as to be unfit for use for a number of days, and that, during this time, a large amount of grain was transferred by other means than the device of appellee, and that, as to this grain, complainants below were entitled to recover seventy cents per car, less the amount of the excess in the cost of switching and transferring the cars, containing such grain, by complainants' method, over the cost by the old method. The Master found that the number of cars, so transferred while the house was undergoing repairs, was

487, and that the amount of such excess in cost was 10.89 cents per car, which, taken from the 70 cents, left 59.11 cents per car. The 487 cars at 59.11 cents per car came to $287.86. There is no dispute about the fact that the house was injured through the fault of appellant, nor about the fact that, while it was unfit for use by reason of such injury, 487 cars were transferred and weighed by other means than through the new method.

The third objection to the decree is the allowance of an item of $748.92 against appellant. The court found that many other cars of grain besides the 487 cars above mentioned had been transferred and weighed by the appellant by other methods than through the transfer house of complainants, and that complainants were entitled to transfer and weigh all such cars to the extent of the capacity of their house, except such as the owners thereof ordered not to be so weighed. The Master found, that 1267 of such cars were transferred on the track by appellant in January, February and March 1885, which could have been transferred and weighed through the house of complainants, and that defendant below should pay the complainants for these 1267 cars, at the above rate of 59.11 cents per car, making $748.92.

We think that both of these items were properly allowed. It is claimed, that complainants below were not entitled to transfer and weigh all the grain that was to be transferred in Cook County from western cars to defendant's cars for trans-shipment to the seaboard, and that defendant was only bound to weigh and transfer, through the transfer-house of complainants, such amount of grain, as it chose not to transfer and weigh by some other mode. This is the main ground upon which the payment of the items in question is resisted.

The second covenant of the second party provides that the second party "will receive, weigh and transfer all products contemplated by this agreement *which may be delivered to his said transfer house* by or under the direction of said first party."

This is said to mean, that Richards was only to weigh, etc., such grain as should be delivered to him, and not necessarily all the grain, which might be in appellant's hands for the purpose of being weighed and transferred. It is claimed, that, by the language used, the railroad Company had an option to deliver into the transfer house only such grain as it chose to deliver.

A fair construction of all the provisions of the contract leads to the conclusion that complainants were to have all the weighing and transferring, which it was in the power of the company to give. Otherwise it would have been folly for Richards to spend over $20,000.00 in building the house and putting up the machinery at his own cost upon the company's ground, with no arrangement for any other tracks to run into it, or be used in it, except those of the appellant company. The preamble of the contract recites that one of its objects is "to provide a cheaper method of transferring grain * * * and for this purpose *to use the device of the second party.*" The second of the second party's covenants provides, that "if said second party shall fail to transfer as fast as required, the said first party may transfer by such other method as it deems proper." This plainly implies that the company could only transfer by some other method when Richards should fail to transfer as fast as required. The proof does not show, that appellant ever made any demand upon appellee for weights and transfers that was not complied with. On the contrary the testimony, fairly considered, sustains the finding of the master, that the grain, transferred by the appellant outside of the transfer house, could have been transferred therein. Another covenant provides, that an additional building should be constructed "*to meet all the necessities of the party of the first part,*" in case the present transfer house should be "*inadequate to meet the requirements of said party of the first part.*" By these words it was manifestly contemplated by the parties, that the appellant was to look to the methods and facilities furnished by appellee

to meet all its necessities and requirements in the matter of weighing and transferring grain. The same intention appears from many other clauses in the agreement, which it is not necessary to comment upon. It follows, that appellant violated the contract and deprived the complainants below of realizing a legitimate profit from their business, when it took away from them the weighing and transferring of a large amount of grain, and had it weighed and transferred elsewhere and by other methods.

The bill prayed for a reformation of the contract by the addition of a clause making the railroad company bear the entire expense of the switching and transferring of the grain passing through the transfer-house. Cross-errors are assigned by appellee upon the refusal of the chancellor to grant the prayer of the bill in this respect.

There is no provision that the company should pay anything in the matter of such expense, except one half the saving mentioned in the third covenant of the first party as above quoted. Nor is there any provision that it should pay anything in case there should be no saving. We think the trial court ruled correctly in holding that the complainants below were not entitled to a reformation of the contract in the respect here indicated.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

Mr. Justice Bailey having heard this cause in the Appellate Court, took no part in its decision here.