**Charles A. Bird, Defendant in Error, v. Edwin Thanhouser, Plaintiff in Error.**

**Gen. No. 15,394.**

1. CONTRACTS—*when evidence of custom competent.* Evidence as to the meaning in a business or trade of the words or terms employed, or, indeed, of usages or customs in a trade explaining a contract, *held*, in this case, not only competent but necessary to a proper trial.

2. CONTRACTS—*what competent to determine true meaning.* It is error to permit a witness to place his meaning upon terms employed by him without showing that the other party to the contract recognized such meaning or that such meaning was the usually accepted meaning in the trade or calling in question.

3. DEPOSITIONS—*when motion to suppress not essential.* If questions and answers are wholly incompetent, based upon a wrong theory of the law of evidence and the rights of the parties, a mo-

tion to suppress is not essential but objections at the trial are proper and in apt time.

4. COPYRIGHTS—*when question of existence pertinent.* In a suit for royalties, *held,* under the evidence, that the question whether the play in question was copyrighted, was pertinent upon the question of liability.

5. COPYRIGHTS—*when question of existence may be determined by state courts.* Contracts which have for their subject-matter patents and copyrights are within the jurisdiction of the state courts although the direct question of the validity of the apparent grants may not be.

Error to the Municipal Court of Chicago; the Hon. JOHN W. HOUSTON, Judge, presiding. Heard in this court at the October term, 1909. Reversed and remanded. Opinion filed April 13, 1911.

G. P. SAYERS, for plaintiff in error; F. WM. KRAFT, of counsel.

ADOLPH MARKS, for defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

The judgment involved in this writ of error, which was for $400 and costs, against the plaintiff in error in favor of defendant in error, must be reversed and the cause remanded for errors by the court below in the rulings on evidence.

The issues in the case turned on a contract made, if made at all, by a telegram sent by Bird (plaintiff below) to Thanhouser (defendant below) on or about August 24, 1908, and by the answer thereto by telegram of Thanhouser to Bird of August 25th. Two preceding telegrams between the parties have a bearing also on the case, and the statement of the material questions in it can be best made by prefacing the statement by these four telegrams as they appear in the record, noting, however, that the method by which they are claimed to have been proven will be alluded to hereinafter.

Bird was a theatrical manager in New York. Than-

houser was a theatrical manager in Chicago. A popular play called "The Devil" had been produced in New York, but not in Chicago.

Bird telegraphed Thanhouser:

"New York, August 23rd, 1908.

Can offer you The Devil at ten per cent with guarantee of $400."

Thanhouser telegraphed Bird:

"Chicago, August 24th, 1908.

I want The Devil. You know size of my house. Won't you please make me the lowest possible figure and advise me by wire if you can ship manuscript and parts at once."

To which Bird replied by telegraphing Thanhouser:

"New York, August 24, 1908.

Price four hundred dollars. Ship manuscript and parts at once."

Thanhouser then telegraphed Bird:

"Chicago, Aug. 25th.

I will take The Devil at four hundred. Express manuscript and parts complete quick, wire when shipped."

The "manuscript" and "parts" were forwarded by Bird to Thanhouser and duly received by Thanhouser. According to Thanhouser's testimony he retained them four or five days and then returned them, making no use of them, but producing the play afterward from another manuscript. His production of it was the first in Chicago, but "other versions," he says, were produced the following week at other theatres in Chicago. His claim in his testimony is that he did not use "the manuscript and parts" because when they reached him he had learned that the play was "common property and could be produced by any one;" that it was, as he otherwise expressed it, an "unprotected" and not a "protected" play, as he thought it was when negotiating for it. We take it that this must mean, as his counsel seemed to indicate during the trial, that he thought it was a copy-

righted play, and that it turned out not to be a copyrighted play. That would seem to be, under the circumstances, the meaning of a "protected" play, although, like other things in the evidence which demanded fuller explanation, the matter is left more or less vague and indefinite by the testimony.

A witness who was in the "theatrical exchange and play brokerage business" was asked by counsel for the defendant if he knew whether "The Devil" was a copyrighted or uncopyrighted play. The question and the matter involved was ruled irrelevant and immaterial by the court, however, and the question, therefore, which would naturally have followed, whether the play was or was not copyrighted, was not asked. The court expressly ruled, however, that it was not material whether the play was "protected or unprotected," "copyrighted or uncopyrighted."

In the deposition of the plaintiff Bird, however, he testified (not responsively to the question asked): "I am the sole owner and holder of the play 'The Devil' and all royalties for same are due to me." This answer was given in the following connection:

Interrogatory 52 was: "The defendant in this action made a claim that The Shubert Theatrical Company was interested in the play which you leased to him. Do you remember that claim?" Mr. Bird's answer was, "I do."

Interrogatory 53 was: "Will you state whether or not the Shubert Theatrical Company had any interest in the play 'The Devil'?" the answer being: "None whatever. I am the sole owner and holder of the play 'The Devil' and all royalties for same are due to me."

The deposition was taken at the instance of the plaintiff, and no motion to suppress it was made before the trial. Nor was the defendant represented at the taking of the depositions and no cross-interrogatories were filed or objections made to the interrogatories or to their answers at such taking. This

particular answer was not objected to on the trial, although others were.

It can, we think, be seen from the foregoing statement that there are many things very undesirably left unexplained in the telegrams which are alleged to form the basis of the claim for which this judgment was rendered. This view is fortified in our minds when it appears that on August 27, 1908, after receiving some telegraphic complaint, the definite nature of which does not appear, Mr. Bird wrote Mr. Thanhouser as follows:

"I was a little bit surprised to receive your telegram this morning. * * * I have sent you the manuscript and parts as per your telegram, and you will find the version proper in every particular. *I am perfectly willing to make proper reduction to you provided you use it a second or third week, but naturally must insist upon the fulfillment of this contract with you as per your telegram.*"

And on August 28th: "It does not matter to me what other productions you use or how often you do so. You are expected to use this production within a reasonable time, and *when it has been done* you are to remit me at this office $400.00." (The italics are ours.)

What did Bird sell to Thanhouser? The "use" of the manuscript of a play, as the statement of claim says? If so, for how long? Or was the sale an absolute one of a certain manuscript and separated parts? Or was it a "lease" of such manuscript, and if so, on what conditions? Its possession simply, or the "production" of the play?

The telegrams related to a business well understood doubtless by both parties, who were theatrical managers of long experience. Evidence as to the meaning in the business or trade of the words or terms employed, or indeed of usages or customs in the trade, explaining the contract, would have been competent, and was, in our view, necessary to enable this case

to be tried properly. While custom or usage cannot make a contract nor break a contract, it may explain a contract. Lyon & Co. v. Culbertson et al., 83 Ill. 33; Currie v. Syndicate, 104 Ill. App. 165; 12 Cyc. 1082 "Customs and Usages." But no evidence of this sort was offered. The necessity of a construction to be placed on the words used was recognized, but this manifestly improper interrogatory was addressed to the plaintiff when his deposition was taken:

"Will you explain, Mr. Bird, what *you* meant by the words, 'Can offer you The Devil'?" (Of course the italics again are ours.)

The counsel for Thanhouser when the deposition was read on the trial objected to an answer to this interrogatory, on the ground that it was improper for the witness to explain what he meant—that being for the jury. The court overruled the objection and the witness answered:

"Can offer,—technically can offer you the manuscript and parts enabling a production of the play called The Devil."

The next interrogatory was: "Will you state what *you* meant by ten per cent with a guarantee of four hundred dollars?"

Counsel for defendant at the trial objected to this also on the ground that it was incompetent for the witness to state what he meant. The objection was overruled and the witness answered: "That I was to receive a royalty of ten per cent upon the gross receipts of the house for the week of nine performances or less, and that in any event I was to be guaranteed four hundred dollars. This four hundred guarantee to be paid no matter what the receipts were below four thousand dollars."

These questions and answers relate to the first of the four telegrams before recited. In relation to the third of those telegrams (the second sent by Bird to Thanhouser), this interrogatory was put to Bird in the deposition:

"State again what *you* meant by 'Price four hundred dollars'?"

Counsel for Thanhouser again objected on the same grounds as before. The court overruled the objection, but the question was not answered.

These questions and answers were plainly improper. It would have been proper to have ascertained whether these various words and terms had a usual, generally understood meaning in the business, limiting or connoting them; but to allow the witness to place *his* meaning on them and state it to the jury, with no evidence that the defendant knew what that meaning or connotation was, was unjustifiable and might have been misleading and injurious to the defendant by giving the jury to understand that such meaning and connotation were controlling.

Nor do we think that in view of the objection made at the trial, the fact that no motion was made before the trial to suppress the deposition, or these particular questions and answers, prevents the plaintiff in error here from taking advantage of the error.

The questions and answers were not of that kind in which the retaking of the deposition would have remedied the error. Winslow v. Newlan, 45 Ill. 145; I. C. R. R. Co. v. Foulks, 191 Ill. 57.

They were wholly incompetent, based apparently on a wrong theory of the law of evidence and the rights of the parties. They could have been excluded at the trial without damage to the plaintiff's competent evidence in the deposition, and should have been so excluded. For this reason if no other, the judgment should be reversed and the cause remanded for a new trial.

But we think further that the refusal of the court to allow the defendant below to introduce any evidence as to whether the play was "protected or unprotected," "copyrighted or noncopyrighted," and as to whether the language and terms of the telegraphic correspondence indicated or implied that the play

was represented by the plaintiff Bird as a protected play or not, was also erroneous. It is unnecessary to specify here the questions on this subject ruled out by the court, but the proposition was distinctly stated by defendant's counsel as his claim that "in a contract to put a play on in a theatre the necessary implication is that it is a copyrighted play."

The court ruled out all questions involving this position. But the answers thereto might have thrown light on the real meaning as understood by both parties to the contract.

The court also ruled out all evidence offered as tending to show that the play in question was unprotected or uncopyrighted, telling defendant's counsel to save his point.

We think this was error, especially in view of Bird's own testimony hereinbefore recited, in which he said that he was "the sole owner and holder of the play 'The Devil,' and all royalties for same were due to him," and that *his* meaning in his own telegram was that he could "offer Thanhouser the manuscript and parts *enabling* a production of the play."

It is argued by defendant in error that the question of the validity of a copyright being cognizable only by the Federal Courts, the matter of copyright could not be in any way properly brought into the suit at bar, because this would put at issue collaterally the question whether the defendant in error had a valid copyright of the play.

We do not agree with this proposition. Contracts which have for their subject patents and copyrights are within the jurisdiction of the State courts, although the direct question of the validity of the apparent grants may not be. Havana Press Drill Co. v. Ashurst et al., 148 Ill. 115; Pratt & Co. v. Paris Gas Light Co., 155 Ill. 531; Rhodes v. Ashurst, 176 Ill. 351.

It was time enough to refuse evidence concerning the regularity or validity of any copyright grant when the question whether such copyright *prima facie* ex-

isted was proven or disproven, and the further question decided whether the contract by implication referred to a supposedly protected or copyrighted play.

Much complaint, which would have been proper had the objection been taken in time, is made by the plaintiff in error as to the method of proving the telegrams which it is claimed constituted the contract. But in view of the fact that no objection or cross-interrogatories were interposed when the notice was given and the interrogatories filed, and no motion to suppress made before the trial, and that Mr. Thanhouser at the trial made no denial of the versions given, we are not inclined to hold the admission of the secondary evidence as produced erroneous. The objection was not of the nature of that which we have held unwaived.

But for the errors pointed out the judgment is reversed and the cause remanded.

*Reversed and remanded.*