[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 427 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 428 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 429 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 430 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 431 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 432 
There was a conflict in the evidence whether the plaintiff consented to the specific settlement made by the defendants with Osborn Cammack, the defendants insisting that such consent was given, and the plaintiff denying it.
The jury were instructed that if there was no such consent the plaintiff was entitled to a verdict, and the verdict is conclusive upon that point. In addition to the claim that the plaintiff expressly consented to the settlement, the defendants *Page 435 
gave evidence tending to establish that on different occasions, on the morning of the twenty-fourth of September, the plaintiff, upon being asked for margin sufficient to bring the gold up to the market price, stated to the defendants that he was unable to do it, that he had no money, and, referring to the sudden and extraordinary rise in gold on that day, added: "This ruins me; I hope it won't ruin you; you must take care of yourselves." This was denied by the plaintiff; but the counsel for the defendants requested the court to charge the jury that, if this was said, it authorized the defendants to make the settlement, and also obviated any objection to the form of the demand or the reasonableness of the time to comply therewith. These requests were separately refused, and exceptions taken.
The learned judge, in delivering the opinion at the General Term, notices only the first, and overruled the exception upon the ground that the request was too broad, and construed it as a request that if the jury found that the language was used, they must also find that the settlement was made as testified to, and in good faith; in other words, that the request involved an adoption by the court of the reality and bona fides of the settlement. If there had been nothing else in the charge on the subject, the request might be subject to the criticism suggested; but other portions of the charge tend to qualify its meaning. These requests were the last made on either side, and were made at the close of the charge, and must be deemed to have been made with reference to what had taken place. The judge had charged the jury that, if the plaintiff did not consent to the settlement, he was entitled to a verdict, thereby ignoring any effect from the injunction to take care of themselves. He had also charged, at the request of the plaintiff's counsel, specifically that the demand for immediate payment of the margin was illegal, and that if the defendant did answer "I can't give you the money; you must take care of yourselves," his legal rights were not thereby prejudiced. He had also charged that the defendants had no legal right to make a private settlement, but were obliged, *Page 436 
if the plaintiff was in default, to make the purchase of gold at public sale. He had also submitted the question to the jury whether any settlement had been, in fact, made. The request was after all this had been charged, and the point of it is that, assuming that the rights and obligations of the parties were as charged, yet, if the plaintiff told the defendants that he was ruined, and they must take care of themselves, it authorized a private settlement, although otherwise illegal. It did not profess to foreclose the question whether the settlement was made, nor of its validity, but only presented the question of authority sufficient to justify a settlement. This is confirmed by the subsequent request that this language, if used, obviated a more formal demand, which the judge had ruled was insufficient on account of the omission to specify the precise sum demanded, and also operated as a waiver of the reasonableness of time to comply with it, the court having ruled that the plaintiff was entitled to have until the close of banking hours of that day for that purpose.
This latter request did not involve the question of the settlement, and shows that the point intended to be presented was only whether the effect of the language used was a waiver of any of the strict legal rights of the plaintiff, assuming that the court had correctly determined what they were. It is quite evident from the charge made, and the refusals to charge as requested, that the learned judge intended to rule that the language specified, if used as the defendants had testified, could not, as a matter of law, operate as a waiver or change any of the legal rights which the plaintiff might otherwise insist upon, or authorize the defendants to pursue any other than the strict rules to put the plaintiff in default, and impose any liability upon him in closing the transaction. In considering whether this was erroneous, it is pertinent to refer to the attending circumstances.
The defendants had sold $404,000 of gold short, for the plaintiff, and, according to the usual custom in transacting that business, had borrowed the gold to deliver. They had *Page 437 
received from the avails of the gold sold, and from the plaintiff, payment for the gold at 140. On the morning of the twenty-third gold was quoted at 140½, and at night it reached 143. On that day the defendants called upon the plaintiff for an additional margin of $7,481.05, which would secure the gold at 141½. The plaintiff was absent from the city on that day, and his clerk delivered some collaterals to the defendants, accompanied by a promise to give a check the next morning, which was not done. On the morning of the twenty-fourth, at ten o'clock, gold opened at 150, and rose rapidly until, at about half-past eleven o'clock, it reached 162½, and at a quarter past twelve the market broke and went as low as 136, and soon after dropped to 133. The effect of the sudden and unprecedented rise in gold, as the evidence shows, was to produce the most intense excitement and consternation among those concerned in such transactions. At one time the plaintiff was deficient in margin more than $80,000, while within an hour afterward he might have closed the transaction with a balance in his favor of something over $25,000. The interviews between the parties took place during the height of the excitement, when everything was uncertain. Whether gold would depreciate or go to a much higher figure, whether the rise would continue during the day or for several days, and whether it would remain permanent or not, were questions of doubt and apprehension.
When the defendants called for additional margins, as they had a right to, if the plaintiff did say to them in earnest and seriously, as claimed, "I have no money; I cannot put up any more margin. This ruins me; I hope it won't ruin you; you must take care of yourselves," it was pregnant with authority and consent that the defendants might take any course to save themselves from loss which would be deemed prudent and judicious under the circumstances in which they were placed. It could scarcely have been more significant if the language had been, "the sudden rise in gold ruins me, and I now authorize you to adopt any course which will be most likely to save yourselves from loss on my account." This *Page 438 
is the natural import of the language. If the plaintiff had intended to face the storm and stand upon his rights, he would either have remained quiet or made a different answer. It would have been idle after that for the defendants, who had borrowed the gold upon their personal responsibility, to have given the plaintiff formal notice of the precise amount demanded. They were authorized to act for their own interest and as they would for themselves. This was the request of the plaintiff, and distinguishes the case from that class of cases where the party is not foreclosed by a mere declaration beforehand of inability to perform an executory contract. (4 Exch., 359; 5 M. W., 475.)
Under this authority the defendants had the right to close the transaction or not, and to do it in any proper and judicious manner. They were bound to act prudently and discreetly. They could make the settlement if, under all the circumstances, that was wise and proper. Such a course was usual between brokers when acting for themselves, and the authority allowed the defendants so to act.
We think it should have been submitted to the jury to find whether the plaintiff gave this authority, and, if so, whether the settlement was made in good faith and was a discreet and judicious exercise of the power conferred. If it was they should be protected. If the defendants acted too hastily or unwisely, or if there was collusion or bad faith in the settlement, they ought not in morals or law to have the benefit of it. The transaction should be viewed from the stand-point occupied by the parties at the time. It was an exciting occasion; the day itself is stigmatized by all the witnesses, and has been since known as "Black Friday." It is now known that certain persons produced a corner (as it is called) in gold, for purposes of speculation and plunder If the truth had then been known, those interested would probably have acted differently. So, too, as the market broke badly soon after twelve o'clock, it is clear that the settlement at 150 was unfortunate. If gold had advanced to 200 and remained for several days or even for one day, it would have *Page 439 
been regarded as most advantageous. It is not for us to determine which one, if either, of these parties should suffer the whole loss; but we think the circumstances alluded to should have been submitted to the jury for their consideration.
The court erred in rejecting the evidence of Follows (taken debene esse) of the conversation with the plaintiff on the morning in question. The declarations of a party relating to the controversy, or any material question involved in it, are always admissible.
The defendant, Cox, testified to the amount of gold the defendants were carrying for the plaintiff; and he had an interview with the plaintiff, between nine and ten o'clock on that morning, at which the plaintiff told him that he was unable to put up any more margin. It was offered to be shown, by the evidence of Fellows, that he had a conversation, between nine and ten, with the plaintiff, who stated his situation with the defendants and his inability to make good his margin; that soon after he had a second interview, when the same thing was repeated; and that he also stated the amount of gold that the defendants were carrying for him. This was all excluded, except the time at which the interview took place. The conversation related to the controversy between the parties, and tended in some degree to corroborate the evidence of Mr. Cox as to the conversation which he testified to, and which, we have seen, materially affected the relations of the parties and their rights in the premises. The declarations, as far as they went, agreed with those stated by Cox, and were substantially the same, except the request sworn to by the latter, that the defendants must take care of themselves.
After the plaintiff had been sworn, this evidence was competent, upon two grounds. The plaintiff gave evidence tending to show that his pecuniary situation was not such as would be implied from his statements to Fellows and Cox. He stated that his credit was good, and that there were sources from which he could raise money; and the evidence was pertinent *Page 440 
in answer to that. Again, the plaintiff denied making the statement to Fellows, especially at the first interview, and it was competent for the purpose of impeaching his credibility. It was not collateral, but related to the material question litigated on the trial, whether the plaintiff consented to the settlement, or made such a request, or gave such authority to the defendants as justified them in making the settlement.
There are other serious questions presented which it is unnecessary to consider.
The judgment must be reversed and a new trial granted, costs to abide the event.
All concur.
Judgment reversed.