Whitesides *v.* Hunt *et al.*

No. 10,775.

WHITESIDES *v.* HUNT ET AL.

97 191
128 426

97 191
149 145

97 191
165 511

PRACTICE.—*Amendment.*—*Demurrer.*—An amendment of a pleading, after a demurrer to it has been sustained, takes the original out of the record, and no error can be assigned upon the ruling on the demurrer.

SAME.—*Open and Close.*—Complaint by a commission merchant, for commissions and advances made in the purchase of wheat for the defendant. Answer, that no wheat was purchased, but the transaction was a gaming contract and wager upon the future price of wheat. Reply, general denial.

*Held,* that the plaintiff had the open and close.

GAMING CONTRACT.—*Public Policy.*—*Sale.*—*Delivery.*—A contract in form for the purchase of wheat, to be delivered at a future day, with the intention of both parties that the property is never to be delivered, but that settlement shall be made by payment of the difference in price at the date fixed for delivery as compared with the purchase price, is a gaming contract and void as against public policy. *Aliter,* if this be understood by only one of the parties.

From the Johnson Circuit Court.

*R. M. Johnson,* for appellant.

*G. M. Overstreet, A. B. Hunter, H. C. Allen* and *L. H. Bisbee,* for appellees.

FRANKLIN, C.—Appellees, as commission merchants, sued appellant for commission and money advanced in the purchase of five thousand bushels of wheat. The transaction was consummated through the Chicago Board of Trade.

The defendant answered that no wheat was actually purchased; that the transaction was a contract upon margins, and gaming upon the future price of wheat, and to be settled by paying or receiving at a future day the difference between the price of wheat then and at the date of the contract; that the advancements of margins made were to keep the payment of differences secure, and that the contract was contrary to public policy, illegal and void.

Appellees replied by a denial. There was a trial by jury, verdict for the plaintiffs, and, over a motion for a new trial, judgment was rendered upon the verdict.

The errors assigned are :

1st. Overruling the motion for a new trial.

2d. Overruling the demurrer to the complaint.

3d. Sustaining the separate demurrers to each paragraph of the answer.

As to the third specification, appellant did not stand upon the rulings upon the demurrers to his answer, but filed amended paragraphs of answer; and the original ones to which the demurrers were sustained are not in the record. Therefore, this specification presents no question for consideration. As to the second specification, appellant has not discussed or even referred to it in his brief. It must, therefore, be considered as waived. The overruling of the motion for a new trial is the only specification to be considered.

The reasons stated for a new trial are :

*First.* The verdict is not sustained by the evidence.

*Second.* The verdict is contrary to law.

*Third.* Error occurring at the trial in awarding the plaintiffs the right to open and close the argument.

*Fourth.* Error in admitting the testimony of Lee Hunt as to the contents of a telegram.

*Fifth.* Error in giving instructions.

We will consider these specifications in the inverse order of their statement. The instructions complained of read as follows:

" 1. Plaintiffs claim that defendant is indebted to them in the sum of $12.50 as commission due them as commission merchants in the purchase of five thousand bushels of wheat; also, that they purchased in the city of Chicago five thousand bushels of wheat for the defendant, and by the terms of such sale the defendant was required to place in their hands a sufficient sum of money to protect and indemnify them against loss, and by reason of the decline in wheat, the sum of $200 in the hands of plaintiffs belonging to the defendant was not a sufficient protection and indemnity to them against loss ; and after notice to defendant to place in their

hands a greater sum of money, they sold the wheat, which they claim the right to do, at a loss to them of $487.50, from which deduct the sum of $200, made a clear loss of $287.50.

"2. The defendant insists that they purchased no wheat, nor did the plaintiffs sell him any wheat, but that in the month of February, 1882, he contracted with plaintiffs for the purchase of 5,000 bushels of wheat, to be delivered in the month of March, 1882, with the mutual understanding that no wheat was purchased or sold or would be required to be delivered, but that the transaction should be adjusted between the parties upon the bases of the market value of wheat in Chicago at the date of the pretended purchase and pretended sale (or maturity of the contract), when, in fact, no wheat was bought or sold. In brief, a bet or wager on the price of wheat at a given time.

"3. If defendant did purchase of plaintiffs 5,000 bushels to be delivered to him at a future date, this would be a legitimate and proper transaction, and it is competent for parties to make such contract.

"4. It is for you to determine from the evidence whether the plaintiffs were, by the nature of the contract, authorized to sell the wheat before the maturity thereof, and whether the plaintiffs should have served notice upon defendant that a further deposit of money was demanded from him to make his contract good, and if, in point of fact, such notice was served on defendant.

"5. If by the terms of the contract and nature of the business, the plaintiffs required of the defendant any sum of money 'to make his deal good,' it was the duty of plaintiffs, before they could 'close him out,' or sell his wheat, to notify him of such fact and give him a reasonable time to respond. Unless there was such a usage or custom in the business being transacted, and in connection with the transaction out of which the alleged indebtedness grew, of which the defendant was advised or had notice, and demand was waived by

him, then the plaintiffs, by selling the wheat before the date of delivery of the wheat or the maturity of the contract for delivery, could not sell the same and charge the defendant with the loss thereon.

"6. If the plaintiffs purchased the wheat for the defendant, and by reason of his failure, he failed to put up further margins to protect them after ' a call ' therefor, and by reason of such failure, they did, to protect themselves from loss, while holding such wheat for the defendant, sell the same, and a loss was incurred, and this was within their contract, and so contemplated and understood by them, then the defendant must make the loss good, and respond in damages to the extent of such loss.

"7. If the sum of money sued for was paid out at the request of defendant, or a liability was incurred by the plaintiffs at request of defendant, whereby they were required to pay out such sum of money upon such liability for his use and benefit, then he should refund such sum of money thus paid out.

"8. If it was the mutual contract of parties plaintiffs and defendant, and they so mutually understood the same, that no wheat was actually to be delivered, and that the contract was not, in fact, to be performed, and ' the deal ' should be settled upon the basis of the contract and market price, then the plaintiffs can not recover in this case. But it is not sufficient that the defendant so understood the contract or ' deal,' but the plaintiffs must be a party to such contract and understanding. If it was a proper and lawful contract on their part, and entered into by them in good faith, intending to perform the same, then it is immaterial as to the private understanding of defendant."

The class of contracts that forms the subject of this suit has become so extensive in business transaction, and has recently so often been before the courts, that we deem it advisable to give the subject a more extended investigation than usual. Trading in options, and buying what are called "fu-

tures," have become parts of the commercial transactions of the country.

It was formerly held that when the vendor had neither the goods, nor entertained any contract to buy them, at the time of the sale, nor had any reasonable expectation of receiving them by consignment, but intended to go into the market and buy the articles he engaged to deliver, no action could be maintained on such contract. But that rule has been changed by the later authorities, and there have been numerous decisions, particularly in this country, holding that the vendor may contract for the sale of an article not in his possession, and this doctrine seems to be entirely in accordance with the rules of public policy. *Bryan* v. *Lewis*, Ry. & Moody, 386, and note *a*; *Wolcott* v. *Heath*, 78 Ill. 433; *Brua's Appeal*, 55 Pa. St. 294; *Brown* v. *Hall*, 5 Lans. (N. Y.) 177; *Noyes* v. *Spaulding*, 27 Vt. 420; *Hibblewhite* v. *McMorine*, 5 M. & W. 462; *Kingsbury* v. *Kirwin*, 43 N. Y. Super. Ct. (J. & S.) 451; *Pixley* v. *Boynton*, 79 Ill. 351; *Rumsey* v. *Berry*, 65 Me. 570; *Disborough* v. *Neilson*, 3 Johns. Cas. 81; *Cassard* v *Hinman*, 1 Bosw. (N. Y.) 207; *Ashton* v. *Dakin*, 4 H. & N. 867; *Chapman* v. *Campbell*, 13 Grat. 105; *Cole* v. *Milmine*, 88 Ill. 349; *Logan* v. *Musick*, 81 Ill. 415; *Gregory* v. *Wendell*, 39 Mich. 337.

In the last case cited, the court says: "The mercantile business of the present day could no longer be successfully carried on if merchants and dealers were unable to purchase that which as to them had no actual or potential existence. A dealer has a clear right to sell and agree to deliver at some future time that which he then has not, but expects to go into the market and buy; and it is equally clear that the parties may mutually agree that there need not be a present delivery of the goods, but that such delivery may take place at some other time."

There is a difference, and a distinction must be made, between a contract where there is a *bona fide* intent to fulfil the agreement according to its terms, and those where the difference in the market price is to be paid.

There can be no doubt but that sales of a commodity to be delivered at some other time are valid, but if the parties agree at the time of making the contract that no title to any property shall pass or any delivery be made, or when, from the nature of the contract, it must be apparent that the intent of the parties was such that at some future specified time the losing party should pay to the other the difference between the selling price at that time and the time of making the contract, it would be a contract which the law would refuse to enforce, for the reason that it is clearly a wager upon the price of the commodity at some future day.      *Yerkes* v. *Salomon*, 11 Hun, 471; *Grizewood* v. *Blane*, 11 C. B. 526; *Story* v. *Salomon*, 71 N. Y. 420; *Pickering* v. *Cease*, 79 Ill. 328; *Lyon* v. *Culbertson*, 83 Ill. 33 (25 Am. R. 349); *Bigelow* v. *Benedict*, 70 N. Y. 202 (26 Am. R. 573); *Maxton* v. *Gheen*, 75 Pa. St. 166; *Peabody* v. *Speyers*, 56 N. Y. 230; *Williams* v. *Tiedemann*, 6 Mo. App. 299; *Sampson* v. *Shaw*, 101 Mass. 145 (3 Am. R. 327); *Kirkpatrick* v. *Bonsall*, 72 Pa. St. 155; *Clarke* v. *Foss*, 7 Biss. 540; *Rudolf* v. *Winters*, 7 Neb. 125; *Waterman* v. *Buckland*, 1 Mo. App. 45; *In Re Green*, 7 Biss. 338; *Bartlett* v. *Smith*, 13 Fed. Rep. 263; *Beveridge* v. *Hewit*, 8 Brad. 467; *Enderby* v. *Gilpin*, 5 Moore, 571; *Swartz's Appeal*, 3 Brewst. 131; *Barnard* v. *Backhaus*, 52 Wis. 593; *Everingham* v. *Meighan*, 15 Cent. L. J. 255; *Cameron* v. *Durkheim*, 55 N. Y. 425.

In the case of *Rumsey* v. *Berry*, *supra*, the court very clearly defines the line which separates the two classes of contracts, the legal from the illegal.   In that case, it was said: "A contract for the sale and purchase of wheat to be delivered in good faith at a future time is one thing, and is not inconsistent with the law.   But such a contract entered into without an intention of having any wheat pass from one party to the other, but with an understanding that at the appointed time the purchaser is merely to receive or pay the difference between the contract and the market price, is another thing, and such as the law will not sustain.   This is

what is called a settling of the differences, and as such is clearly and only a betting upon the price of wheat, against public policy, and not only void, but deserving of the severest censure."

In the case of *Kent* v. *Miltenberger*, 16 Cent. L. J. 433, in the opinion by THOMPSON, J., it was held that where by the terms of the contract, the commodity, at the maturity of the contract, may be required to be delivered, or damages recovered for the breach, unless a delivery is waived by the opposite party, the contract will be held to be legal, unless there is an express agreement made, at the time of the contract, that the property should not be delivered, and that such an agreement, subsequently made, would not vitiate the contract.

In the case of *Cobb* v. *Prell*, 16 Cent. L. J. 453, in the opinion by MCCRARY, J., it was held that the fact that the intention of the parties to a contract of the sale of commodities for future delivery is, that there shall be no actual delivery, but that the transaction shall be settled by the payment of the difference between the selling and market price, will render such contract void, and that all the circumstances and acts of the parties may be considered in determining their intention. We think this case the better authority. A contract to sell a commodity for future delivery, coupled with an express agreement, made at the time, that the commodity, at the maturity of the contract, shall not be paid for or delivered, but shall be settled for by difference on prices, is no contract of sale at all. And well may the learned court in that case admit that such a contract is illegal and void.

The trouble arises where, at the date of the contract, there is no express agreement as to payment and delivery, and where those questions are to be settled by implication, based upon the understanding and intention of the parties.

In the case of *Union Nat'l Bank* v. *Car*, 16 Cent. L. J. 320, it was held, that " The validity of option contracts depends upon the mutual intention of the parties. If it is not the in-

tention in making the contract, that any property shall be delivered or paid for, but that the fictitious sale shall be settled on differences, the contract is illegal. But if it is the *bona fide* intention of the seller to deliver, or the buyer to pay, and the option consists merely in the time of delivery within a given time, the contract is valid, and the putting up of margins to cover losses which may accrue from the fluctuations of prices, etc., is legitimate and proper."

In the case of *Justh* v. *Holliday*, 17 Cent. L. J. 56, it was held : " Where a contract is made for the delivery or acceptance of securities at a future day, at a price named, and neither party at the time of making the contract, intends to deliver them or accept them, but merely to pay differences, according to the rise or fall of the market, the contract is a gambling one and is void as contrary to public policy. The endorser of a promissory note given on account of such dealings as are recognized as gambling transactions can rely upon their illegality as a defence to an action on the note. In an action to recover money, where the defence set up is that the contract was a stock gambling one, the real question for determination is the *bona fides* of the transaction. It is not the form but the intent with which the scheme was planned. If neither party contemplates that there should be a delivery of the stock, but merely to pay differences according to the rise or fall of the market, the contract is a gambling one."

In the case of *Bryant* v. *Western Union Tel. Co.*, 17 Cent. L. J. 361, the court says : " The complainants never buy or sell for present delivery, but always deal in futures and upon margins. Whenever the required margin is placed in the hands of complainants, they will buy or sell, as customers desire, grain, etc., at the last quotation of the Chicago Board of Trade. This is always for the next or succeeding month's delivery, and the deal is taken by the complainants themselves. The customer must always keep his margin good, and that without notice ; and if any time before the time fixed for the delivery, the market in Chicago goes against the customer to the extent of

his margin, the trade is closed and the complainants take the margin and the customer is not personally liable, the extent of his loss being his margin. If, however, the market should go in favor of the customer, he may call for a settlement at any time and without regard to the maturity of his contract, and he is then paid the difference between the then market price and the price at which he bought or sold, less a sum which is called by complainants 'a commission.' This sum, which is one-fourth of a cent on each bushel of grain which is alleged to be bought or sold, is not a commission, as the complainants always take the deal themselves, and do not pretend to buy or sell to others for the account of the customer, but is really the odds which the customer gives them in the wager on the future of the market. It is perhaps true if the customer keeps his margin good, so that he can not be closed out, and does not exercise his right to settle upon the basis of the difference in the prices of the grain, etc., he can demand a compliance with the contract and a delivery; but if the course of business between the complainants and their customers is to settle their alleged contract by a payment of the differences in the market rates, the fact that a customer may, under certain circumstances, require an actual delivery, does not relieve the complainants from the charge of carrying on a 'bucket-shop.' It is the general course of a man's business which defines and classifies it. If 'bucket-shop' means a place where wagers are made upon the fluctuations of grain and other commodities, then I think the evidence shows the complainants keep such a 'shop,' and are of the class to which defendants are prohibited from furnishing the market quotations of the Chicago Board of Trade. This is gambling, and a very pernicious and demoralizing species of gambling, which a court of equity should not protect, even if the board of trade had not taken the action it has. It is true that this kind of gambling has not yet been made criminal by the statute law of the State, still if a case of wager is made out, none of the State courts will enforce such contracts. *Sawyer* v.

*Taggart,* 14 Bush, 727.   Gambling on the fluctuation in the market prices of stocks, grains, etc., is against the public policy of the State, though it may not be a crime punishable by fine or imprisonment."

In the case of *Cunningham* v. *National Bank of Augusta,* 17 Cent. L. J. 470, it was said : "It is manifest that the consideration of the note sued on is for, and on account of dealings commonly called futures.   Is such a transaction in the nature of gaming ?   If so, then, the note was void at the time it was given ; and no subsequent transfer could revive or give vitality or any legal validity to a contract thus tainted and poisoned at its birth. * * The plea expressly alleges the transaction to be 'a wagering and gaming contract.'   But what is the transaction termed futures ?   It is this : one person says, 'I will sell you cotton, at a certain time in the future, for a certain price ; you agree to pay that price, knowing that the person with whom you have to deal has no cotton to deliver at the time ; but with the understanding that when the time for delivery arrives, you are to pay me the difference between the market value of the cotton and the price you agreed to pay, if cotton declines ; and if cotton advances, I am to pay you the difference between what you promised to give and the advanced market price.'   If this is not a speculation on chances, a wagering and betting between the parties, then, we are unable to understand the transaction.   A betting on a game of faro, brag or poker can not be more hazardous, dangerous or uncertain. * * *  What are some of the consequences of these speculations on 'futures'?   The 'faithful chroniclers of the day' have informed us that, as growing directly out of these nefarious practices, there have been bankruptcies, defalcations of public offices, embezzlements, forgeries, larcenies and deaths. Certainly, no one will contend for one moment, that a transaction fraught with such evil consequences is not immoral, illegal and contrary to public policy."

In the case of *Rudolf* v. *Winters,* 7 Neb. 126, the Supreme Court of that State held, that "A contract to operate in grain

options, to be adjusted according to the differences in the market value thereof, is a contract for a gambling transaction which the law will not tolerate. It is *contra bonos mores,* and against public policy." And a number of the heretofore cited authorities, with others, are referred to in support thereof.

In the case of *Lyon* v. *Culbertson,* 83 Ill. 33, the following language is used : " The fact that no wheat was offered or demanded, shows, we think, that neither party expected the delivery of any wheat, but, in case of default in keeping margins good, or even at the'time for delivery, they only expected to settle the contract on the basis of differences, without either performing or offering to perform his part of the agreement ; and if this was the agreement, it was only gaming on the price of wheat, and if such gambling transactions shall be permitted, it must eventually lead to what are called ' corners,' which engulf hundreds in utter ruin, derange and unsettle prices, and operate injuriously on the fair and legitimate trader in grain, as well as the producer, and are pernicious and highly demoralizing to the trade. A contract, to be thus settled, is no more than a bet on the price of grain during or at the end of a limited period. If the one party is not to deliver or the other to receive the grain, it is, in all but name, a gambling on the price of the commodity, and the change of names never changes the quality or nature of things. * * * This seems to be a subtle invention to abrogate well established, fair and just principles of the law of contracts, and not only so, but to the great injury of fair and legitimate trade."

In the case of *Brua's Appeal,* 55 Pa. St. 294, it was said : "Anything which induces men to risk their money or property without any other hope of return than to get for nothing any given amount from another, is gambling, and demoralizing to the community, no matter by what name it may be called. It is the same whether the promise be to pay on the color of a card, or the fleetness of a horse, and the same numerals indicate how much is lost and won in either case, and

the losing party has received just as much for the money parted with in the one case as the other, viz.; nothing at all. The lucky winner of course is the gainer, and he will continue so until fickle fortune in due time makes him feel the woes he has inflicted on others.    All gambling is immoral.    I apprehend that the losses incident to the practice disclosed * * have contributed more to the failures and embezzlements by public officers, clerks, agents and others acting in fiduciary relations, public and private, than any other known, or perhaps all other causes. * * In the train of its evils, there is a vast amount of misery and suffering by persons entirely guiltless of any participation in the cause of it."

We conclude from the foregoing authorities, that in this class of cases, the correct rule is, that where a commodity is bought for future delivery, no matter what the form of the contract is, the law regards the substance and not the shadow, and if the parties mutually understood and intended that the purchaser should pay for and the seller should deliver the commodity at the maturity of the contract, it is a legal and valid transaction, and the fact that the purchaser is required to deposit a margin, and increase the same at any time the market requires it, in order to secure the payment at maturity, or that the seller shall deposit a margin and increase the same like the purchaser in order to secure the delivery at maturity, does not vitiate the contract.    But if at the time of the contract, it is mutually understood and intended by all the parties, whether expressed or not, that the commodity said to be sold was not to be paid for, nor to be delivered, but that the contract was to be settled and adjusted by the payment of difference in price; if the price should decline, the purchaser paying the difference; if it should rise, the seller paying the advance, the contract price being the basis upon which to calculate differences—in such case, it would be a gambling contract and void, and the deposits of margins are only to be considered as attempting to secure the terms of the bet on prices at some future time.

But it is insisted by the appellees that they only acted as agents of the appellant in the premises, and as such agents they paid the money at the request of appellant, and that they have the right to recover the same back, regardless of the question as to whether the contract for the purchase of the wheat was legal or illegal.

The suit is upon the implied contract of the appellant to pay. The appellees made the contract for the purchase of the wheat through their agent in the Chicago Board of Trade; they never disclosed to appellant the name of the seller, and if the contract was illegal, they can not be considered ignorant of its nature. They claim to be commission merchants, doing business in the Chamber of Commerce at Indianapolis, and through commission merchants in Chicago, under the rules and regulations of the Board of Trade at Chicago; they purchased for the appellant 5,000 bushels of wheat, and paid to said commission merchants in Chicago $200 that appellant had deposited with them as a margin. The price of wheat declined, and the defendant refused to deposit further margins to carry the " deal;" appellees " closed him out," and settled with the commission merchants at Chicago by paying them the further sum, for differences in prices, of $287.50; hence the appellees participated in, and were the chief manipulators of, the whole transaction, and well knew all the facts. If it was a valid and legal transaction, they would have a right to recover back the money which they had paid for appellant; but if the transaction was a gaming one, illegal and void, they would not have a right to recover; for, if illegal, they were *in pari delicto*, and will not be aided by the courts in profiting by their own wrong. They will be left where they are found, to abide the consequences of their own illegal transaction. *Judah* v. *Trustees, etc.*, 23 Ind. 272; *Root* v. *Stevenson*, 24 Ind. 115; *Dumont* v. *Dufore*, 27 Ind. 263; *Bartlett* v. *Smith*, 13 Fed. R. 263; *Steers* v. *Lashley*, 6 T. R. 61; *Holman* v. *Johnson*, Cowper, 341; *Rountree* v. *Smith*, 15

Reporter, 609; *Irwin* v. *Willard*, Chicago Legal News, March 12th, 1884.

If the seventh instruction stood alone, it might, perhaps, sustain appellees' above position, and in that case we think it would be erroneous, as applicable to the facts in this case, but it is connected with, and qualified by the preceding and succeeding instructions, which make the validity of the contract to depend upon the mutual intention of the parties. All the law applicable to the case is not required to be stated in one instruction; they must be considered as a whole, and if together they present the law of the case correctly, and without contradiction, objections to any one of them separately will not be available. *Western Union Tel. Co.* v. *Young*, 93 Ind. 118.

We do not think that there is any available error in the instructions; nor do we think that there is any error in the admission of evidence, in so far as the questions presented are concerned, or the giving of the plaintiffs the right to open and close the evidence and the argument to the jury.

It is further earnestly insisted by appellant that the evidence does not sustain the verdict of the jury.

The material parts of the testimony are, substantially, as follows:

John R. Fesler testified that appellant, Whitesides, lived in Johnson county, Indiana, and that he, as said Whitesides' agent, on the 28th day of January, 1882, gave to Hunt & Hamilton, at Indianapolis, a verbal order to purchase at Chicago 5,000 bushels of wheat for March delivery; he knew they were dealing in optional grain trades at Chicago; had previously had deals with them, and Mr. Whitesides had had one deal with them; he knew they were dealing through the Board of Trade at Chicago, and made the order with a view of such dealing; he was familiar with their manner of trading through the Board of Trade at Chicago; some two weeks after he made the order for Mr. Whitesides, Mr. Hunt asked him about Mr. Whitesides, and said that his margins were

about exhausted, and wanted witness to see him and have him send more money; he saw Mr. Whitesides and spoke to him about it, who said that he was going to Indianapolis, and that he would see Hunt & Hamilton; at the time of giving the order Whitesides had money on deposit with Hunt & Hamilton; did not know how much, nor for what purpose; supposed it was to protect the trade; it was customary to deposit money for that purpose, and if not sufficient at any time to protect an agent in carrying a trade, it was customary to pay up more money, or be sold out, at the pleasure of the agent who was carrying the trade.

Lee Hunt testified that the plaintiffs were commission merchants, doing business in the city of Indianapolis, in the board of the Chamber of Commerce; that before this transaction, Mr. Fesler introduced Mr. Whitesides to them at their office, and Whitesides then said he wanted to make some trades; would not be there often, and any order that Mr. Fesler would give would be all right. Mr. Whitesides came in afterwards and directed the purchase of five thousand bushels of wheat. After that Mr. Fesler ordered them to purchase other five thousand bushels of wheat for Mr. Whitesides. Mr. Whitesides had left money with them and had made a trade previous to this one. When Fesler left the order, witness telegraphed to Chicago, and the five thousand bushels of wheat was purchased for Mr. Whitesides for March delivery, at $1.32½ per bushel, through Murphy & Co., members of the Board of Trade in Chicago. Afterwards wheat declined, and he drew on Mr. Whitesides for more money; he failed to respond. Witness then "asked Fesler in regard to Mr. Whitesides' responsibility to respond to losses on wheat, and he said that Whitesides was able to protect it, and would do so." Whitesides failed to pay more money, and the trade was closed out at $1.23 per bushel. The firm of Hunt & Hamilton was liable to their correspondent in Chicago for any purchases which they ordered made, and kept a deposit there to protect any orders sent by them, "and

this loss was charged up to their account," and they settled by paying the amount of the loss, $487.50, upon this transaction; they were entitled to a commission of $12.50, to be divided between their firm and the Chicago firm, all of which they paid; Mr. Whitesides had previously left with them $200, for the purpose of protecting any trade he might make with or through them.

This purchase was made in accordance with the rules and regulations of the Chicago Board of Trade. There was no written contract. These rules and regulations were contained in a volume, and were too numerous to read in evidence, as but few of them were applicable to this transaction. Did not know whether they had any wheat in Chicago at the time of this transaction; had no special contract with Mr. Whitesides, simply held his $200 to secure them against loss, and used it in that way; did not know whether the seller deposited any money as margins or not.

William D. Whitesides testified that he lived in Johnson county, Indiana; that he had a slight acquaintance with the plaintiffs, Hunt & Hamilton; he was introduced to them by Mr. Fesler, at their office in Indianapolis, at the Chamber of Commerce, in the Board of Trade building; he then told Mr. Hunt that he "thought of making a purchase in margins;" Hunt asked what he wanted to buy; he said wheat; Hunt then said that he would have to put up $200 on five thousand bushels of wheat; nothing was then said about Fesler acting as his agent; afterwards Mr. Hamilton told him that any word that he might send by Col. Fesler would be carried out; he afterwards told Fesler that he had money on deposit with Hunt & Hamilton, amounting to $200, and when he thought it to be a good time to buy, to do so; he said that he wanted to buy wheat, and when he thought that it was a good time, he would also buy for witness; he afterwards got word from Mr. Hunt that he had bought five thousand bushels of wheat for him, through Mr. Fesler; Mr. Fesler afterwards told him the same; this was some two

weeks after the purchase; they drew on him for money; had no understanding with Hunt & Hamilton about the seller putting up any margins; "he did not expect any wheat to be delivered, but expected it to be settled on differences of prices;" had "settled the transaction before this one on the difference between the selling and the purchasing price of five thousand bushels of wheat in Chicago;" Hunt & Hamilton told him they owed him $12.50 besides their commission upon that sale of five thousand bushels of wheat; they had no authority from him to sell the second five thousand bushels of wheat; did not see them after the purchase; did not expect any wheat to be delivered, and knew nothing about any being delivered; nothing was said about delivering any wheat either in the first or second transaction, and he was not expecting any to be delivered even at the time for delivery, unless the wheat was paid for, but he supposed that there was no actual wheat in the trade, and that a settlement would be made upon differences in prices.

In rebuttal, Fesler testified that Hunt & Hamilton required margins to keep a man's trade good, and if the parties held the contract at the time of its maturity, the wheat would be delivered; that on contracts made like this one for wheat through Hunt & Hamilton, where the parties hold until the time the contract matures, the wheat is delivered; he had had deliveries made to him of oats and corn, but not of wheat. (This testimony was objected to, but its admission was not stated as a reason for a new trial.)

Lee Hunt testified in rebuttal, that in this transaction between plaintiffs and defendant, there was no intention but what the goods would be delivered if the contract was held until it matured; they had had a great many goods delivered; they had such a delivery yesterday; the wheat in this contract, when matured, was delivered out on the sale that was made on account of Whitesides failing to keep his contract good; he knew this only from the fact that when in Chicago he went through the books with Murphy. (A motion to

strike out this testimony was overruled, but the ruling has not been stated as a reason for a new trial.)

The evidence shows that this transaction was had under the rules and regulations of the Chicago Board of Trade, and appellees in their brief admit that section 5 of rule 24 reads as follows:

"Should any party, called upon as herein provided for, fail to deposit the security or margins called for within the next banking hour thereafter, the party making such call shall have the right, if he be the seller, to re-sell the property for account of the delinquent, such re-sale to be for the same delivery as was named in the original contract; if it be the buyer, he shall have the right to re-purchase the property for account of the delinquent, deliverable at the time named in the original purchase; in either case he shall at once communicate to the delinquent the action he elected to take, and all losses or damages on such defaulted contracts shall be at once due and payable, the same as though said contracts had fully matured."

By another clause of the rules and regulations of said Board of Trade, the settlement of all contracts should be considered as a sale and purchase.

The regulations also provide for settlements between members of the Board of Trade by offsets, cancellations and substitutions. Under which rules and regulations the books are so kept as to show regular transfers of the property, whether there was any actual transfer by sale and delivery or not; and it is beyond controversy that a large per cent. of these transactions are settled upon the basis of the difference in prices, without the payment of a cent on the purchase-price, or the delivery of a particle of the commodity said to be purchased. The participators, denominated "bulls and bears," with their "puts and calls," run prices up and down, and form what are called "corners" in the trade, then force settlements whether the contracts have matured or not. And under their cunningly devised system of offsets, cancellations and substitu-

tions, they are enabled to square up their dealings among themselves and procure a settlement of the differences by absorbing the margins paid in, and requiring outside customers to foot up losses, the manipulators thereby amassing large and princely fortunes, while reducing to bankruptcy and ruin a large and meritorious class of customers, who have been unwittingly duped into their folds, under the seductive influences of trying to get money without earning it. Such transactions are not only gaming, illegal and void, but they are a cheat, a swindle and a fraud upon the legitimate trade and commerce of the country.

While honest trade and commerce, in a legitimate way, in all commodities, should be rigidly upheld as the great lever of individual and national prosperity, fictitious, illegitimate and illegal trading, not based upon values paid out and received, should be discouraged and prevented in every legitimate way possible.

It is evident from the evidence in the case under consideration, that appellant's understanding and intention was only to engage in a speculation on prices. The small nibble that he had previously made at the hook only induced him to bite again, with a hope of getting a larger bait. But the evidence is very meagre as to the surroundings of the appellant; it does not show his business or occupation; whether he was a miller and wanted to purchase wheat for manufacturing purposes, or a shipper and wanted the wheat for transfer and legitimate commerce, or whether he was a mere adventurer guessing upon prices, and willing to risk his money upon the hazard, without any ability to pay the contract price, is not developed in the evidence. Nor does it appear from the evidence that the appellees were interested in, knew anything about, or made any inquiry in relation to, appellant's ability to pay for the wheat. The only thing they required was the putting up of sufficient margins to cover shrinkage in prices, and the only inquiry they made was as

to the appellant's ability to pay losses.   To secure the declins in prices was all they appeared to care for.   But notwithstanding these circumstances, tending to show a mutual understanding between the parties that the wheat was not to be paid for or delivered, in the rebutting evidence, Mr. Fesler testified that the wheat would have been delivered at the maturity of the contract if the margins had been kept good to that time.

Mr. Lee Hunt, one of the plaintiffs, also testified that at the time of the sale there was no intention that the wheat should not be delivered at the maturity of the contract, if the margins were kept good ; and if this had been done the wheat would have been delivered to the defendant at the maturity of the contract ; that, according to the books of the Chicago Board of Trade, this wheat was delivered to the subsequent purchaser upon the original contract at its maturity.   According to the well known practice, under the rules and regulations of the Chicago Board of Trade, the fact that the books showed a delivery of the wheat, if legitimate testimony for any purpose, furnished but very slight evidence of an actual delivery of the wheat.   Still this rebutting evidence clearly tends to show that the intention not to deliver the wheat, at the maturity of the contract, was not mutual.   And if either party contracts in good faith, he is entitled to the benefit of his contract, no matter what may have been the secret purpose or intention of the other.   *Rumsey* v. *Berry,* 65 Maine, 570 ; *Williams* v. *Carr,* 80 N. C. 294 ; *Gregory* v. *Wendell,* 39 Mich. 337.

The burden of the defence rests upon the defendant.   *Wright* v. *Crabbs,* 78 Ind. 487 ; *Parker* v. *Hubble,* 75 Ind. 580.

The jury must have confided in the rebutting testimony, or they could not have found for the plaintiffs.   The intention of the parties was a question to be decided by the jury, and when their decision has been approved by the court, who heard all the evidence, in refusing to grant a new trial, it matters not what we may think of the merits of the weight of the ev-

idence. A well established rule of decision of this court, in such cases, prevents any interference with the verdict of the jury.

There is no available error in overruling the motion for a new trial. The judgment ought to be affirmed.

PER CURIAM.—It is therefore ordered, upon the foregoing opinion, that the judgment of the court below be and it is in all things affirmed, with costs.

